## CHICAGO AND NORTHWESTERN RAILWAY COMPANY *v.* UNITED STATES.

1. A railroad company, in aid of which Congress granted land, entered, September, 1875, into a contract with the United States to transport for four years the mails over its road at a price which conformed to the statute then in force. It received from the Postmaster-General due notice of his orders, reducing the rates of compensation, pursuant to the act of July 12, 1876, c. 179 (19 Stat. 78), and the act of July 17, 1878, c. 259. 20 id. 140. The company protested against the order, but performed the stipulated service. *Held*, that it is entitled to recover the contract price therefor.
2. Those acts apply only to contracts thereafter made, or to such as did not require the performance of the service for a specific period.

APPEAL from the Court of Claims.

The Chicago and Northwestern Railway Company owns and operates lines of railroad, of which parts were constructed by companies which severally received from the United States, to aid in their construction, grants of public lands, to which was attached this condition: "The United States mail shall be transported over such roads, under the direction of the Post-Office Department, at such price as Congress may by law direct: *Provided*, that, until such price is fixed by law, the Postmaster-General shall have the power to determine the same." Act of May 15, 1856, c. 28 (11 Stat. 9); Act of June 3, 1856, c. 42, id. 18.

In September, 1875, the company entered into three contracts in writing with the United States, acting by the Post-

master-General, each for conveying the mail on a certain route numbered and described therein, over a part of its line, for four years from July 1, 1875, at a fixed price per annum, being at the rate of a specified sum per mile. These contracts are in the usual form prescribed by the department, and specify the services to be performed, among other things requiring the company to convey, free of charge, all mail-bags and post-office blanks, and all accredited agents of the department free of charge, and to collect from postmasters on the route quarterly balances due from them to the government, and account for the same; and stipulate for the payment of fines to be imposed upon the company for certain defaults. The ninth clause of each is as follows: " That the Postmaster-General may discontinue or curtail the service, in whole or in part, whenever the public interests, in his judgment, shall require such discontinuance or curtailment for any cause, he allowing, as a full indemnity to the contractor, one month's extra pay on the amount of service dispensed with, and a *pro rata* compensation for the amount of service retained and continued."

These contracts were made by the Postmaster-General under the authority of the following sections of the Revised Statutes :—

"SECT. 3942. The Postmaster-General may enter into contracts for carrying the mail, with railway companies, without advertising for bids therefor.

" SECT. 3946. No contract for carrying the mail shall be made for a longer term than four years, and no contract for carrying the mail on the sea shall be made for a longer term than two years."

The prices agreed to be paid were in conformity to the provisions of sect. 1 of the act of March 3, 1873, c. 231 (17 Stat. 558), being sect. 4002 of the Revised Statutes.

In the act of July 12, 1876, c. 179, making appropriations for the service of the Post-Office Department, &c., Congress inserted the following provisions, viz. : —

" That the Postmaster-General be, and he is hereby, authorized and directed to readjust the compensation to be paid from and after the first day of July, 1876, for transportation of mails on railroad routes by reducing the compensation to all railroad companies

for the transportation of mails ten per centum per annum from the rates fixed and allowed by the first section of an act entitled 'An Act making appropriations for the service of the Post-Office Department for the fiscal year ending June 30th, 1874, and for other purposes,' approved March 3d, 1873, for the transportation of mails on the basis of the average weight."

" Sect. 13. That railroad companies whose railroad was constructed in whole or in part by a land grant made by Congress on the condition that the mails should be transported over their road at such prices as Congress should by law direct, shall receive only eighty per centum of the compensation authorized by this act." 19 Stat. 79, 82.

On Aug. 18, 1876, the Postmaster-General issued an order, which was communicated to the company, reciting the foregoing provision relative to the ten-per-cent deduction, and stating that the Assistant Attorney-General of the Post-Office Department had advised, with reference to railway service performed under contract with the government, " that when the contract has been made in due form of law with a railroad company for the transportation of the mails for a term not yet expired, such contract is not affected " by the provision.

On Oct. 20, 1876, the Postmaster-General issued another circular, reciting that provision, and also sect. 13 of the act of 1876, and informing the company that, as required by that section, a reduction of twenty per cent would be made for mail service performed after July 1, 1876, upon the routes over the roads aided by land grants.

To this notice the company replied with a protest against the proposed reduction, as in violation of its contract.

The act of June 17, 1878, c. 259 (20 Stat. 140), contains this provision : —

" That the Postmaster-General be, and he is hereby, authorized and directed to readjust the compensation to be paid from and after the first day of July, eighteen hundred and seventy-eight, for transportation of mails on railroad routes, by reducing the compensation to all railroad companies, for the transportation of mails, five per centum per annum from the rates for the transportation of mails, on the basis of the average weight, fixed and allowed by the first section of an act entitled 'An Act making appropriations for

the service of the Post-Office Department for the fiscal year ending June thirtieth, eighteen hundred and seventy-seven, and for other purposes,' approved July twelfth, eighteen hundred and seventy-six."

On July 29, 1878, the Post-Office Department notified the company that there would be a reduction of five per cent from its compensation, under this act, against which the company promptly protested.

The company performed all the service required by its contracts during the entire period covered by them; but deductions from the contract rates were made, in accordance with the notices of the department, at each settlement, amounting in the aggregate to $83,310.91, for which the company, on July 14, 1879, after the contracts had been completely performed on its part, brought the present suit. The Court of Claims rendered judgment in its favor for the sum of $876, being the amount of the deductions for the service performed from July 1 to July 12, 1876, the latter being the date when the first act, under which they were made, took effect.

From this judgment the company appealed.

*Mr. John F. Farnsworth* for the appellant.
*The Solicitor-General* for the United States.

MR. JUSTICE MATTHEWS, after stating the case, delivered the opinion of the court.

The power of Congress to direct by law the price at which the mail service here in question should be performed was expressly reserved as a condition of the land grants, which formed, in part, their motive and consideration. But when Congress authorized the Postmaster-General to fix the price by contract, within specified maximum rates, and for a period of four years, it was an agreement on the part of the United States that the stipulated compensation should not be withheld during that period, which it could not refuse to perform without a breach of the public faith. The contract was an exercise of the reserved power, with an added obligation not to exercise it otherwise for the period agreed on, and we are unable to perceive any ground on which its validity can be denied. The

stipulations in the contract on the part of the railroad company transcend its necessary obligations, growing out of the acceptance of the conditions of the land grant, and furnish a sufficient and distinct consideration for the promise of the government not to disturb the rates of the contract during the period of its existence; for there are several stipulations collateral to the service to be rendered, which the government could not have exacted as due by previous obligation and irrespective of the assent of the company.

The power to establish the price includes the power also to declare the period of its duration; and if it be said that any contract which fixes both the price and its duration must be construed as subject to the continuous control of the power which made it, it must also be admitted that no change can be made without the abrogation of the contract. The government, whatever power it may reserve over its own agreements, cannot impose new contracts upon those with whom it deals. It might by a repeal of the contract, expressly stipulated, restore the previous state, and claim the bare rights it had before; but it cannot do more than that. It certainly cannot retain the obligation of the contract as against the company, and at the same time vary its own, unless it has reserved the right to do so in the contract itself.

Some claim of this kind is put forward in the present case, and the ninth clause in the contracts is referred to as containing such a reservation. Clearly this confers power upon the Postmaster-General to discontinue or curtail the service, in whole or in part, he allowing, as an indemnity to the contractor, a month's extra pay on the amount of service dispensed with, and a *pro rata* compensation for that retained and continued. But this is not a power to reduce the compensation for the full service performed, or to alter the terms of the contract. It is true, that under this reservation the Postmaster-General would be authorized to discontinue the entire service contemplated by the contract, and the practical effect of that would be to terminate the contract itself, on making the indemnity specified. But in that event, the contract being at an end, the company would no longer be under any obligation except that imposed by the original conditions accepted with

the land grants, and the government could rightfully impose upon it no others. There is, therefore, in the contract itself, no power reserved to alter the amount of compensation, except by a reduction of the required service. If the government insists upon full performance of that, it can be only upon the terms fixed by the contract.

It is argued, however, on the part of the government, that the legal effect of what was done was to abrogate the old contracts and make new ones. It is claimed that the passage of the acts of Congress of July 12, 1876, c. 179, and of June 17, 1878, c. 259, and the notices from the Post-Office Department that the reductions assumed to be contemplated by them would be insisted on; the fact that they were made in the adjustment of accounts, and that the railroad company, notwithstanding its protest, continued to perform the service, — had the effect to supersede the contracts of 1875, and substitute new ones in their stead, on the basis of the reduced compensation. Such, in substance, was the view taken by the Court of Claims.

In our opinion, that view cannot be maintained. The contracts of 1875 were for four years, and were expressly authorized by law. They were, therefore, valid, and binding on the United States as well as upon the railroad company. They contained, within themselves, a mode for lessening, or, if deemed best, for discontinuing entirely, the described service; and provided for a proportionate reduction of the stipulated compensation. In no other mode could the contract be changed, except by the mutual assent of the parties. Any change attempted by either, otherwise, would have been merely a breach of the agreement; and the United States would have been liable to damages for its breach, on the same principles and to the same extent as a private party, for which a suitable remedy was provided by law in the jurisdiction conferred upon the Court of Claims. In this respect, the relation between the parties was that of perfect equality in right.

If, in these circumstances, the government not merely accepted, but demanded, the performance of the contract service, the presumption is that it meant to pay the contract price. It would require positive and express words to negative that presumption. We find none such in the statutes of 1876 and

1878.  Their language may be well satisfied by confining them to cases where no time contracts for service were then in existence, and to contracts thereafter to be entered into. They do not legitimately apply to contracts then existing, whose terms had not expired, such as those in the present case.

Such was the opinion of Mr. Attorney-General Taft, to whom the Postmaster-General submitted one of the contracts on which this suit is founded, for his opinion, whether it was affected by the act of 1876.  He replied in the negative, saying : —

"In my opinion, Congress did not intend it to have this effect.  The contracts, of which that with the Chicago and Northwestern Railway submitted by you for inspection is a sample, were authorized by the law in force at the dates of their execution.  They bound both parties.  A breach of them by either would subject the delinquent to a claim for damages. The act of July 12, 1876, was apparently passed with a view to reduce the public expenses.  But it would not have this effect if an equivalent to the reduction of pay were recoverable under the name of damages, with, perhaps, the expenses of litigation added.  Therefore I conclude that the construction most consistent with justice and fair dealing is the true one, viz., that, as to existing contracts, the rate remains as stipulated in the agreement during the term therein mentioned, but that in those cases where no contract prevailed the reduction should be made."  15 Op. Atty.-Gen. 182.

Of course, if it was not the intention of the acts of Congress referred to, to affect the contracts of the company, the erroneous interpretation of them by the Postmaster-General, and his action under it, cannot give to them any different effect, for the rights of the parties depend on the law itself.  And the performance by the company of the service required by its contract, notwithstanding the notice of the intended reduction of the compensation by the Postmaster-General, cannot be construed as a waiver of its rights or an acquiescence in new proposals ; and that whether it had protested against the erroneous construction of the law or not.  For it had no option.  It was bound by its contract to perform the service, and

its performance was demanded.   It was not in a position abso-lutely to refuse to carry the mails, for it was bound to carry them, if offered, on some terms, either prescribed by law or fixed by contract; and it had the right to do so, without preju-dice to its lawful claims, leaving the ultimate right to future and final decision.   It was not the case of a voluntary payment of an illegal exaction, where the maxim, *consensus tollit erro-rem*, prevents a recovery; because in such case there is the legal presumption of an abandonment of the claim.   *Volenti non fit injuria*.   But here the service was to be performed, at all events, just as it was performed, but under which of two claims was in dispute.   Its performance was a condition of both, and cannot, therefore, be a bar to either.

We are of opinion, for these reasons, that the Court of Claims should have rendered judgment in favor of the ap-pellant for its whole claim.

> *Judgment reversed, and cause remanded with instructions to render a judgment in conformity with this opinion.*