STATE v. ELLIOTT. (No. 7748.)

(Court of Civil Appeals of Texas. Galveston. May 17, 1919.)

1. MASTER AND SERVANT ☞101, 102(1)— DUTY TO EMPLOYER.

The state, as an employer operating state's railroad, is bound to furnish employés with a safe place in which to work.

2. ACTION ☞27(2)—CONTRACT OR TORT—INJURY TO EMPLOYÉS.

A servant injured by negligence of master may elect to sue either on contract or for tort.

3. STATES ☞191(1)—CONTRACTS—LIABILITY.

When the state makes a contract, it is bound as much as a citizen would be bound by a like contract, notwithstanding the state cannot be sued without permission.

4. MASTER AND SERVANT ☞88(1)—STATE'S LIABILITY FOR INJURY TO EMPLOYÉS.

Where the state owned and operated a railroad under Laws 30th Leg. c. 74; Laws 31st Leg. (2d Ex. Sess.) c. 24; Laws 33d Leg. c. 139 (Vernon's Sayles' Ann. Civ. St. 1914, arts. 6745a–6745f), and employed labor, held that the state occupies to such employés the relations of an ordinary employer; and, where an employé was injured through the negligence of agents having supervision and management of the road, the state is liable, though it cannot be sued without permission.

5. LIMITATION OF ACTIONS ☞69—RUNNING OF STATUTE—LEAVE TO SUE.

As a state cannot be sued without permission, limitations against an action by employé on a state railroad, who was injured by those having the management of the road, do not begin to run until permission to sue is granted.

6. LIMITATION OF ACTIONS ☞131—RUNNING OF STATUTE.

Where an employé on a state railroad was injured, and his petition to the Legislature for privilege of entering the courts with his cause of action, of which, under Const. art. 3, § 57, he was required to give advance notice of 30 days, was presented within two years after injury, the running of limitations against an action for such injuries was tolled.

7. LIMITATION OF ACTIONS ☞175—RUNNING OF STATUTE—WAIVER.

As there is no constitutional provision requiring the state to plead limitations in an action against it, the Legislature, on passing an

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

act allowing an employé of a state railroad who was injured to sue, may waive limitations, and provide that limitations should not begin to run until the passage of the act.

8. CONSTITUTIONAL LAW ⬿188—RETROSPECTIVE LEGISLATION—WHAT CONSTITUTES.

Where the Legislature, in passing an act giving an employé of the state railroad permission to sue for injury, provided that limitations should not begin to run until the passage of the act, such act was not under the ban interdicting retroactive statutes.

Appeal from District Court, Anderson County; John S. Prince, Judge.

Action by John H. Elliott against the State of Texas. From a judgment for plaintiff, defendant appeals. Affirmed.

B. F. Looney, Atty. Gen., Luther Nickels, of Eastland, A. G. Greenwood, of Palestine, and C. M. Cureton, and W. J. Townsend, both of Austin, for appellant.

Campbell & Sewell, N. B. Morris, and N. B. Morris, Jr., all of Palestine, and Williams & Neethe, of Galveston, for the State.

GRAVES, J. The Thirty-Fifth Legislature, at its Fourth Called Session (1918), passed an act enabling John Elliott, appellee, to sue the state of Texas for personal injuries alleged to have been suffered by him on or about March 6, 1916, while working for the State Railroad. This act was approved March 25, 1918, and is published as chapter 32, p. 59, Acts of the Fourth Called Session Thirty-Fifth Legislature, and, omitting caption, emergency, and service of process clauses, reads as follows:

"Section 1. John H. Elliott be and he is hereby granted permission to sue the state of Texas for damages for personal injuries received by him while on duty as a bridge carpenter in the employ of the Texas State Railroad about March 6, 1916.

"Sec. 2. That such suit may be filed in the district court of Anderson county, Texas, where the injury occurred, at any time within two years from the date this act takes effect; and said cause of action shall not be barred by limitation until two years from the date this act takes effect.

"Sec. 3. That such suit upon said cause of action shall be tried and determined in the trial and appellate courts according to the same rules of law and procedure, as to liability and defenses, that would be applicable if such suit were against an ordinary Texas railroad corporation; provided any amount determined due plaintiff in accordance with the provision of this act shall be approved by act of the Legislature."

On April 12, 1918, Elliott filed this suit against the state to recover damages for the injuries referred to, setting up this statute as the basis of his right to bring it, and al-

leging the injuries to have been sustained by him on the date given, while at work for the state as a bridge hand on what is known as the Texas State Railroad, which extends from Rusk, in Cherokee county, to Palestine, in Anderson county, in Texas; that by authority of law the railroad had been established, equipped, and was then through a general manager in person and such other agents and servants as are usually employed in that kind of business, being maintained and operated by the state as a common carrier of passengers and freight for hire; that at the time of his injury the appellee, while working under the orders of one of these employés, a foreman in charge of repairing bridges, etc., was riding along this State Railroad in the service of the state upon a push car furnished by the road and this foreman to transport the bridge carpenters to and from this work, and that the push car was negligently derailed, throwing him off and injuring him; that the derailment and his consequent injuries were the direct and proximate result of the negligence of the manager of the railroad, and of his servants, agents, and employés in failing to have and keep the push car in a safe condition, in operating it at a dangerous rate of speed, and in failing to keep and maintain the railroad track itself in a safe condition, in that its rails were allowed to spread and remain too far apart.

Upon the theory that the act thus passed was beyond the power of the Legislature as being an ex post facto or retroactive law, attempting to create liability against the state when none existed at the time of the accident in question, that it operated to suspend the statutes of limitation specially in favor of Elliott, that it essayed by special act to change the rules of liability, evidence, etc., retroactively, and, generally and independently, that the state was not liable for the alleged acts of negligence of its officers, agents, or employés, the same being merely their personal torts or misfeasances, the defendant presented and urged various demurrers and exceptions to the petition, assailing the statute as actually having the effect of contravening all these provisions of the Constitution of Texas:

(1) Section 49, art. 3, which provides that "no debt shall be created by or on behalf of the state, except to supply casual deficiencies of revenue, repel invasion, suppress insurrection, defend the state in war, or pay existing debt."

(2) Section 44, art. 3, reading: "The Legislature * * * shall not grant * * * by appropriation or otherwise, any amount of money out of the treasury of the state, to any individual, on a claim, real or pretended, when the same shall not have been provided for by pre-existing law."

(3) Section 53, art. 3, reciting that "the Legislature shall have no power to grant * * * any extra compensation, fee or allowance to a public officer, agent, servant, or contractor after service has been rendered or a contract has been entered into, and performed in whole or in part."

(4) Section 51, art. 3, providing that "the Legislature shall have no power to make any grant or authorize the making of any grant of public money to any individual * * * whatsoever."

(5) Section 6, art. 16, wherein it is provided that "no appropriation for private or individual purposes shall be made."

(6) Section 56, art. 3, providing that the Legislature shall not pass any local or special law, "regulating the practice or jurisdiction of, or changing the rules of evidence in, any judicial proceeding or inquiry before courts," etc., or "for limitation of civil or criminal actions," or "in all other cases where a general law can be made applicable."

(7) Section 3, art. 1, which is: "All free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services."

(8) Section 16, art. 1, reading: "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."

Other special exceptions averred that the cause of action was barred by the statute of two years' limitation, in that it appeared to have arisen on March 6, 1916, more than two years before the filing of this suit to recover thereon, on April 12, 1918.

There were further defensive pleadings, but, since the demurrers fully raise the only questions presented upon appeal, it becomes unnecessary to recite them.

All the demurrers were overruled, the cause was submitted to a jury on special issues, who, after finding that Elliott sustained his injuries as a direct and proximate cause or result of the negligence of the manager of the railroad, his agents, servants, and employés in charge of and operating the same, in failing to have the track in a reasonably safe condition, and in failing to operate the push car at a reasonably safe rate of speed, fixed his damages at $8,500; from a judgment entered against it pursuant to the verdict the state appeals.

It is first contended the general demurrer should have been sustained below, because "it having appeared from the petition, and being judicially known, that the State Railroad was being operated by agents or servants of the state at the time of the accident in question, and it being alleged that the injuries complained of were caused by the negligence of such agents or servants, no liability accrued against the state by reason of such negligence, and therefore the petition failed to show a cause of action against the state."

Then follow numerous propositions and assignments presenting in extended detail all the above-mentioned constitutional objections, and possibly some others, to the enabling act declared upon, together with citations of authorities, and able arguments in support of the insistence that the act offends the Constitution in quite a number of particulars.

After careful consideration of the issues presented by the appeal, however, aided, as the court has been, by illuminating oral discussion from counsel for both litigants, neither the assault upon the law permitting the suit nor upon the judgment rendered is thought to be well founded; indeed, the state's contentions are to us so comprehensively and satisfactorily answered in the brief filed in this court by the able and experienced counsel for the appellee that, under a feeling that we may not otherwise better express the conclusions reached, the liberty is taken of here adopting this part of it as the opinion of this court:

"Notwithstanding the many assignments of error in appellant's brief, and the many constitutional provisions relied on therein, there is but one really serious question in this case, which is whether or not liability of the state arose out of the facts attending appellee's injury under the principles of law then existing. That question may be presented fully under appellant's first assignment without following all the others in their order.

[1] "First Counter Proposition. The state being the owner of the State Railroad, and doing with it a general railroad business, including that of common carrier, and having, through her agents, duly authorized by the Legislature, entered into a contract of employment with appellee, one of the obligations of which was that the employer, the state, would exercise due care to furnish plaintiff a safe place in which to work, and having failed to exercise such care, thus breaking her contractual obligation and causing the injury to plaintiff, was liable for the resulting damages. Fristoe v. Blum, 92 Tex. 76 [45 S. W. 998], and authorities therein cited; Ry. Co. v. Culberson, 72 Tex. 378 [10 S. W. 706, 3 L. R. A. 567, 13 Am. St. Rep. 805]; Ry. Co. v. Gaskill, 103 Tex. 443 [129 S. W. 345]; Imperial Sugar Co. v. Cabell, 179 S. W. 91; Gibbons v. United States, 8 Wall. 269 [19 L. Ed. 453]; Chapman v. State [104 Cal. 690, 38 Pac. 457] 43 Am. St. Rep. 158; Ry. Co. v. Herbert, 116 U. S. 647 [6 Sup. Ct. 590, 29 L. Ed. 755]; Hough v. Ry. Co., 100 U. S. 216–218 [25 L. Ed. 612]; Ry. Co. v. Fort, 11 Wall. 533, 537 [21 L. Ed. 739]; Wood, Master and Servant, p. 164, § 83; Labatt, Master and Servant, p. 2390, § 898.

[2] "That servant injured by negligence of master may elect to sue either on contract or for tort. Williams v. Southern Ry. Co. [128 N. C. 286] 38 S. E. 894; Kansas City Ry. Co. v. Becker [67 Ark. 1, 53 S. W. 406, 46 L. R. A. 814] 77 Am. St. Rep. 81.

[3, 4] "Second Counter Proposition. By the statutes under which the state constructed, owned, and operated the state railroad, the state voluntarily assumed liability for all such claims as that of plaintiff. Laws 30th Legislature (1907) p. 151; Laws 31st Legislature (1909 2d Ex. Sess.) p. 445; Laws 33d Legislature (1913) p. 279; Vernon's Sayles' Statutes, arts. 6745a to 6745f; Western & Atlantic Ry. Co. v. Carlton, 28 Ga. 180; Ballou v. State, 111 N. Y. 496, 18 N. E. 627; Coleman v. State, 134 N. Y. 564, 31 N. E. 902.

"These propositions, if sound, meet all the objections urged against the statute granting to plaintiff leave to sue. That they are sound is believed to be demonstrable both by principle and by authority.

"No one can deny that when the state makes a contract she is as much bound by it as a citizen would be bound by a like contract. In Fristoe v. Blum, supra, the law is thus stated:

" 'It is well settled that so long as the state is engaged in making or enforcing laws, or in the discharge of any other governmental function, it is to be regarded as a sovereign, and has prerogatives which do not appertain to the individual citizen; but when it becomes a suitor in its own courts, or a party to a contract with a citizen, the law applies to it as under like conditions governs the contracts of an individual. State v. Kroner, 2 Tex. 492; State v. Purcell, 16 Tex. 305; Green v. State, 73 Cal. 32 [11 Pac. 602, 14 Pac. 610]; Carr v. State, 127 Ind. 204 [26 N. E. 778, 11 L. R. A. 370] 22 Am. St. Rep. 624; State v. Snyder, 66 Tex. 700 [18 S. W. 106]; State v. Cardozo, 8 S. C. 79 [28 Am. Rep. 275]; Patton v. Gilmer, 42 Ala. 548, 94 Am. Dec. 665; Danolds v. State, 89 N. Y. 36, 42 Am. Rep. 277; People v. Stephens, 71 N. Y. 549; People v. Canal Commissioners, 5 Denio, 401; Coleman v. State, 134 N. Y. 564 [31 N. E. 902]; State v. Dennis, 39 Kan. 509 [18 Pac. 723]; Morton, Bliss & Co. v. Comptroller, 4 S. C. 448; Davis v. Gray, 16 Wall. 203, 21 L. Ed. 447; Railway v. United States, 104 U. S. 680, 26 L. Ed. 891.'

"In Carr v. State, 127 Ind. 204 [26 N. E. 778, 11 L. R. A. 370, 22 Am. St. Rep. 624], the Supreme Court of that state said: 'As there is a perfect contract, the state is bound to perform it according to its legal tenor and effect, and to redeem the pledge it has declared to be irrevocable. In entering into the contract it laid aside its attributes as a sovereign and bound itself substantially as one of its citizens does when he enters into a contract. Its contracts are interpreted as the contracts of individuals are, and the law which measures individual rights and responsibilities measures, with few exceptions, those of a state whenever it enters into an ordinary business contract.'

"The Court of Appeals of the State of New York in the case of People v. Stephens, 71 N. Y. 549, used the following language: 'The state, in all its contracts and dealings with individuals, must be adjudged and abide by the rules which govern in determining the rights of private citizens contracting and dealing with each other. There is not one law for the sovereign and another for the subject; but, when the sovereign engages in business and the conduct of business enterprises, and contracts with individuals, although an action may not lie against the sovereign for a breach of the contract, whenever the contract, in any form, comes before the courts, the rights and obligations of the contracting parties must be adjusted upon the same principles as if both contracting parties were private persons. Both stand upon equality before the law, and the sovereign is merged into the dealer, contractor, and suitor.'

"The Supreme Court of South Carolina clearly announced the same doctrine in the case of Morton, Bliss & Co. v. Comptroller, in the following language: 'When a sovereign state enters into a contract or bargain with an individual, it assumes to be bound, in all particulars, as an individual under like circumstances would be bound, by what is expressed or properly implied by the terms of such contract. The measure of its obligation is that applied to individuals.'

"The authorities cited above fully justify the conclusion that the contract of Bennick for the purchase of the land from the state bound the state and Bennick each to the same extent as if it had been made between two private individuals. Bennick had all the rights that he would have had if the vendor had been a citizen instead of the state. So long as he paid the purchase money and interest the state could not deprive him of the land. He was within the protection of the Constitution. On the other hand, the state by the common law had the right as a vendor, upon the failure of Bennick to perform his part of the contract, to rescind the sale made to him and resume its control of the land.

"Many other quotations might be given stating the same principle. If the state is bound by her contract as a citizen would be bound, she must be liable as a citizen would be liable for its breach. To say that she is not liable would be to assert that which is inconsistent with the existence of a contractual obligation.

"Because of her sovereignty, the state is not amenable to the processes of courts, and cannot be sued therein, without her consent, but this in no way detracts from the proposition that she may be liable. Generally, she provides for the meeting of her obligations and liabilities in other ways; but she may, if she choose, authorize the courts to determine whether or not a particular obligation or liability exists, and she confers such authority by such an act of the Legislature as that in question. It may be true, under section 44 of article 3 of our Constitution, the Legislature has not the power, by such an act, to impose a liability where none arose out of the facts under the law existing when those facts occurred—in other words, to make a gift or gratuity; but the Legislature undoubtedly has the power to authorize an inquiry in court into the question of liability vel non and then to provide for its discharge if one be established.

"The first counter proposition asserts that there was a contract between the state and the plaintiff, and that the injury to the latter was caused by a breach—nonperformance—of one of the obligations of the contract. Unquestionably the relation between employer and employé is created by contract, and the obligations of each to the other are imposed thereby.

"In Railway Company v. Culberson, supra, that proposition is thus stated: 'But the duties which are owed by a railroad company to its servant are not duties owed to him in common

with the public, but grow out of the contract of service. He assumes the relation of servant to his employer voluntarily, and out of it arises the reciprocal obligations from one to the other.'

"In Railway v. Dunham, 49 Tex. 187, Judge Gould, quoting from New York cases, thus states the doctrine:

" 'Speaking of the master's duty to have placed for the "servant's use proper and adequate physical means, and for his helpmates fit and competent fellow servants," the court says: "That some general agent, clothed with the power and charged with the duty to make performance for the master, has not done his duty at all, or has not done it well, neither shows a performance by the master, nor excuses the master's nonperformance. It is for the master to do by himself or by some other. When it is done, then, and not until then, his duty is met or his contract kept." '

"Further statements of the doctrine are as follows: G. H. & S. A. Ry. Co. v. Smith, 76 Tex. 616 [13 S. W. 562, 18 Am. St. Rep. 78]:

" 'If it be a neglect of one of the duties the master has impliedly contracted to perform, the master is liable, no matter what be the rank or grade of the person he has designated, because that person is an agent, and not a servant; but in all other cases he is not liable, because of the application of the rule as to fellow servants.'

"Brown v. Winona & St. Peter Ry. Co., 27 Minn. 164, 6 N. W. 484, 38 Am. Rep. 285: 'The duties which the contract of employment imposes on the master are that, where machinery or instrumentalities are used in the work, he will exercise due care and caution in providing such as are fit and safe,' etc.

"Railway v. Ranney, 37 Ohio St. 669: 'The respective rights and duties of employer and employé sound in contract. The employer implicitly engages to use reasonable care and diligence to secure the safety of the employé, and, among other things, to exercise reasonable care in the selection of prudent fellow servants,' etc.

"The obligations of employer and employé under the contract of employment are reciprocal. Among those of employer are the payment of wages, exercise of due care to furnish safe tools, appliances, and places to work, and competent fellow servants, etc. Among those of the employé are fidelity, diligence, and the exercise of due care and skill in the performance of the work undertaken. If appellee had, by failure to exercise such diligence, or care, or skill, inflicted injury on property of the state upon which he worked, could any one deny that he would have been liable to the state under his contract of employment? If not, how can it be held that the state did not become liable to him by the same kind of a breach of the same contract —by a breach of one of the reciprocal obligations of the contract? It might as well be said that the state would not be liable for the promised compensation as that she is not bound to perform her other obligations, or to become liable for nonperformance. But it is said that the failure here to exercise proper care was that of officers or agents of the state, and that the state is not legally responsible for torts and other wrongs committed by such officers or agents. It is not contended at this point that she is. The proposition is that she is responsible for her own failure to perform, for her breach of her own contract. That the failure to perform, the breach, may have been due to the fault of the agents to whom performance was intrusted by her in no manner alters the case. As her contracts are made through agents, so must they be broken, if broken at all, by agents. She could not perform except by her officers or agents to whom she committed the duty of performance, and their failure to perform is her failure. This is just as true between her and her servants as it would be between an ordinary master and his servants.

"The books abound with cases in which sovereigns have been held liable for breaches of their contracts by wrongful conduct of their officers or agents. This is one of the precise points decided in Imperial Sugar Company v. Cabell, supra. There the state was bound, as vendee, in a contract with the Sugar Company to do certain things, and left the doing of those things to her officers, as she needs must. Those officers failed and refused to do the stipulated things, and the Sugar Company rescinded the contract. It was contended there as strenuously as it is contended here that the wrong of the officers was not the wrong of the state, but the effect of the contention was denied by this court.

"The confusion of ideas in this contention is obvious. It is one thing to say that the wrongful act of an officer is not the wrong of the state and not imputable to it, but a very different thing to say that the failure of an officer or agent to whom the duty of performance has been committed to perform a contractual obligation which the state is bound to perform is not a breach of that obligation and is not imputable to the state. The action or nonaction of the officer or agent may give rise to a right of action against him in favor of the state, or of the other injured person, but it is nevertheless a breach of the contract of the state. The difference between conduct of an officer, which is a breach of the contract of the sovereign, which makes the sovereign liable, and other conduct of the same officer, which is only his personal wrong, for which the sovereign is not liable, is clearly shown in the case of Gibbons v. United States, supra.

"Gibbons, having a contract with the United States to deliver 200,000 bushels of oats, delivered a part and tendered the remainder. They were wrongfully refused by the quartermaster, thus causing a breach of the contract, and for this the United States was held liable for the damage which resulted to Gibbons. But some time after this breach, which was held to have discharged the contract and released Gibbons therefrom, the same quartermaster required Gibbons, by duress as he claimed, to deliver at the contract price the remainder of the oats, a rise in the market price of oats having been meantime taken place, and Gibbons claimed this difference in addition to the loss sustained by him from the prior refusal to receive. As to this the court held that, if the last delivery was under duress, there was no contract, but only a tort of the officer for which the United States was not liable, and, if there was no duress, the plaintiff consented to make the delivery at the price insisted upon by the quartermaster and was bound by his consent. Thus the court fully recognized the binding force of the refusal of the officer which constituted a breach of the contract, and at the same time held that the

further conduct of the quartermaster, which was not in violation of any contract, since none was then in force, was only a tort not binding on the government.

"It would be difficult to show in a clearer light the distinction here contended for.

"That the liability of the state may arise out of a contract implied by law as well as from an express undertaking is held in United States v. Palmer, 128 U. S. 263, 9 Sup. Ct. 104, 32 L. Ed. 442; United States v. Berdan Fire Arms Co., 156 U. S. 552, 15 Sup. Ct. 420, 39 L. Ed. 530; United States v. Buffalo Pitts Co., 234 U. S. 228, 34 Sup. Ct. 840, 58 L. Ed. 1290.

"The decision in Chapman v. State, supra, approaches yet more clearly to the questions in this case, and in principle is not distinguishable.

"The state of California owned and operated a public wharf which was in charge of its officers, through whose neglect it was allowed to fall into disrepair. Coal belonging to plaintiff was taken upon the wharf, and, on account of its bad condition, the wharf broke away, and the coal fell into the bay and was lost. After stating a statute and a provision of the Constitution of the state, and holding that the statute, which was enacted after the occurrence, could not create liability if none arose under the law existing at the time of the occurrence, and announcing the proposition that the state is not liable for the negligent acts of its officers while engaged in discharging 'ordinary official duties pertaining to the administration of the government,' the court says:

" 'But we are clearly of the opinion that the cause of action alleged in the complaint is not of this character. It is not founded upon negligence constituting a tort, pure and simple and unrelated to any contract, but· is substantially an action for damages on account of the alleged breach of a contract.

" 'The facts stated in the complaint show that the defendant, in consideration of wharfage paid to it, received upon one of its public wharves the coal belonging to plaintiff's assignors, and to be delivered to them on such wharf for removal therefrom. A wharfinger is one who for hire receives merchandise on his wharf, either for the purpose of forwarding, or for delivery to the consignee on such wharf, and the matters alleged in the complaint show a contract of the latter character, and the state is bound thereby to the same extent as a private person engaged in conducting the business of a wharfinger would be under a similar contract. The principle that a state is bound by the same rules as an individual in measuring its liability on a contract is well expressed by Allen, J., in his concurring opinion in the case of People v. Stephens, 71 N. Y. 549, in which he said: "The state in all its contracts and dealings with individuals must be adjudged and abide by the rules which govern in determining the rights of private citizens contracting and dealing with each other. There is not one law for the sovereign and another for the subject. But when the sovereign engages in business and the conduct of business enterprises, and contracts with individuals, whenever the contract in any form comes before the courts the rights and obligations of the contracting parties must be adjusted upon the same principle as if both contracting parties were private persons. Both stand upon equality before the law, and the sovereign is merged in the dealer, contractor, 'and suitor." See, also, Carr v. State, 127 Ind. 204 [26 N. E. 778, 11 L. R. A'. 370] 22 Am. St. Rep. 624.

" 'What, then, was the nature and extent of the obligation assumed by the state when, in consideration of the wharfage paid by them, it received the coal of plaintiff's assignors upon its wharf?

" ' "The wharfinger is bound to return or deliver the goods according to his contract." Edwards on Bailments (3d Ed.) § 362. A wharfinger is impliedly bound by his contract as such to exercise ordinary care for the preservation and safety of property intrusted to him (Edwards on Bailments [3d Ed.] § 359), and this imposes upon him the duty to exercise ordinary care to ascertain the condition of his wharf, that he may know whether it is reasonably safe for the purpose for which he hires it; and if merchandise is received by him upon a wharf which is unsafe, and is thereby lost, so that he cannot deliver it according to his contract, the wharfinger is liable therefor if ordinary care would have enabled him to know the condition of his wharf, and such negligence on his part will be treated as a̓ failure to exercise ordinary care for the safety of the property intrusted to him.'

"After further discussing the contractual obligations of wharfinger, the court proceeds:

" 'We are entirely satisfied that plaintiff's' cause of action, as alleged in the complaint, arises upon contract, and that the liability of the state accrued at the time of its breach— that is, when the coal was lost through the negligence of the officers in charge of the state's wharf—although there was then no law giving to the plaintiff's assignors the right to sue the state therefor. At that time the only remedy given the citizen to enforce the contract liabilities of the state was to present the claim arising thereon to the state board of examiners for allowance, or to appeal to the Legislature for an appropriation to pay the same; but the right to sue the state has since been given by the act of February 28, 1893, and, in so far as that act gives the right to sue the state upon its contracts, the Legislature did not create the liability or cause of action against the state where none existed before. The state was always liable upon its contracts, and the act just referred to merely gave an additional remedy for the enforcement of such liability, and it is not, even as applied to prior contracts, in conflict with any provision of the Constitution.

" 'The fact that the state is not subject to an action in behalf of a citizen does not establish that he has no claim against the state, or that no liability exists from the state to him. It only shows that he cannot enforce against the state his claim, and make it answer in a court of law for its liability. What is made out by this objection is not that there is no liability and no claim, but that there is no remedy. Coster v. Mayor of Albany, 43 N. Y. 407.'

"In the case of Western & Atlantic Ry. Co. v. Carlton, 28 Ga. 180, the plaintiff was a shipper of hogs over the railroad, which was owned by the state and managed by a superintendent, and the suit was for damages caused to plaintiff's hogs shipped over the road caused by the car failing or giving out. It was contended that

the state was not a common carrier and not liable. The contention was thus answered by the court:

" 'When a state embarks in an enterprise which is usually carried on by individual persons or companies, it voluntarily waives its sovereign character, and is subject to like regulation with persons engaged in the same calling. But if, under such regulations, citizens acquire rights for wrongs or injuries sustained at the hands of the agents of the state, in conducting the business in which the state may have embarked, there may be, ordinarily, a difficulty in regard to the remedy to which the injured party might be entitled. In such cases, in England, the king is petitioned in his court of chancery, and the chancellor administers right as a matter of grace, not by compulsion. Here the usual course pursued by the citizen has been to petition the Legislature, and that has been the resort when no other remedy has been provided. The Legislature, however, has wisely and justly provided a remedy for persons having claims against the Western & Atlantic Railroad. They may present them for settlement to the superintendent of the railroad. If a dispute should arise concerning any claim which cannot be amicably settled, a claimant may bring suit against the superintendent of the railroad. We think, then, that the state, engaging in the carrying business, assumes the obligations and liabilities incident to that business when carried on by individuals, and the remedy is by suit against the superintendent of the road when the claim cannot be adjusted without.'

"Now we ask: Is the implied contract of a wharfinger or a warehouseman to exercise care to make his premises safe for the reception of the property of his customers any more contractual or binding than is the implied contract of a railroad company to use care to keep safe for the use of its employés the tracks on which they work, and on which their lives and limbs are daily risked?

"Is a state engaged in conducting the business of a common carrier with a railroad owned by it liable for damage to hogs when it is not liable for injuries inflicted upon men in its services to whom it owes the kind of obligations that a master owes to his servants?

"These decisions are grounded in the principles recognized by other courts in the United States, among them our own, and we submit that it is impossible to deny plaintiff a recovery consistently with those decisions and those principles.

"From the premise that a state is not responsible for the torts of its officers and agents, appellant tries to deduce a conclusion which would well-nigh exclude all liability of the state. A state would not be bound by a contract if it were not liable for its breach. The binding obligation of a contract of a state cannot be denied, and yet that contract must be made by some person or persons representing the state. Likewise, the breach must be committed by some representative, and that representative must be an officer or agent to whom performance is intrusted. Thus it is that the state is made liable for the conduct of such representative amounting to a breach of its contractual undertaking.

"And it is not true in any such broad sense as appellant contends that a state cannot become liable, without contract, for tortious conduct of those representing it. Ordinarily officers and agents performing duties prescribed by law in the ordinary affairs of the government violate those laws or exceed their authority when they perpetrate wrongs. For such conduct no liability of the state arises. But sometimes the officer or agent acts for the state, as did those in charge of this railroad, in doing the very things prescribed by the law under which he acts, in doing which he commits a wrong to another. In such cases liability of the state may arise. Cooley's Elements of Torts (2d Ed.) 141; Bishop Non-Contract Law (1889 Ed.) 749; Green v. State, 73 Cal. 32 [11 Pac. 602, 14 Pac. 610].

"The injured person cannot sue the state without her consent, but this in no way shows that the state is not liable. When consent is granted, the question whether or not there is liability depends on general principles, of which the rule that torts of officers and agents are not imputable to the state is only one, and that is not so universal in its application as to render the state immune from wrongs committed by it through its agents thereunder authorized by it.

"The reluctance sometimes shown to hold states liable results partly from the fact that suits are so rarely brought against them, owing either to settlement otherwise made or to lack of consent, and partly to the influence of the old maxim of the common law that 'the king can do no wrong,' a maxim which has no place in American jurisprudence. Langford v. United States, 101 U. S. 342 [25 L. Ed. 1010].

"Notwithstanding the many declarations of the capacity of states to commit both breaches of contracts and torts which may make them liable to persons thereby injured, their immunity from suit, and the persistence of the feeling flowing from the outworn maxim, have given rise to exaggerated notions in some minds as to their irresponsibility as mischievous as they are harsh and unjust. It should be pleasing to just-minded men to know that the Legislature of Texas was actuated by no harsh or narrow spirit in giving this remedy to this plaintiff, but readily consented to have his claim for compensation put to the proper tests in the courts in the fullest way.

"If it is true, as seems to be thought by counsel for appellant, that the act for plaintiff's relief manifests an intent to make the state liable, or at least to recognize the existence of a liability already accrued, the fact ought to have weight with the courts as a construction by that department of the laws under which this railroad was owned and operated.

"In 1907 an act was passed authorizing the penitentiary board to complete the road, already partly constructed, and to equip, maintain, and operate it, together with a telegraph or telephone line, granting the power of eminent domain, and the power to issue bonds, and to use the proceeds thereof for the purposes set forth, and giving to the Railroad Commission the same jurisdiction over the traffic of this road as it had over that of other railroads.

"In 1909 another, but cumulative, act was passed authorizing a further issue of bonds and a sale of the road when completed. This act pledges the net revenue and income from every source from year to year 'remaining and after the payment of the current expenses and neces-

sary improvements of every character' to secure the bonds.

"The act of 1913 took the management, control, and operation of the road away from the Prison Commission and placed it with a manager. That officer was given full power and authority 'to manage, control, and operate said railroad,' and to employ such assistance as may be necessary for successful operation. To enable the manager to improve, develop, and operate the same, the act appropriated $60,000 out of the general revenue, and provided that all his expenditures thereout should be made with the approval of the Governor. By section 6 the manager was required to keep a system of books, showing receipts and disbursements, to report the same to the comptroller, and to pay the money received during the preceding month into the state treasury; and that section expressly provided that all moneys so received, as well as all appropriated, 'shall be subject to payment for the necessary expenses incurred in the maintenance and operation of said railroad.' As a part of the emergency clause, it was recited that the business is daily increasing, and that life and property are endangered by the condition of the road.

"It is submitted that these acts show:

"(1) That the state caused its railroad to be constructed and operated as other business railroads, and assumed full responsibility for the ownership of the railroad and the business.

"(2) That the state acknowledged its duty to maintain and operate the road in such manner as to protect life and property.

"(3) That it not only recognized its duty to pay expenses of operation and devoted to the payment thereof the revenue derived from operation as one of the first charges thereon, but appropriated money out of the general revenue for the same purpose.

"(4) That it committed to the general manager and those to be employed by him the doing of all these things for the state.

"In the everyday language of courts, railroad men, economists, legislatures, and boards regulating railroads, 'operating expenses' includes payment of damages for personal injuries such as plaintiff's. This is judicially known to the court. If, therefore, a breach of the contract with plaintiff was not enough, of itself, to make the state liable, she assumed liability by these enactments.

"It has been the design in the foregoing discussion affirmatively to present the views of the law sustaining this judgment, so as at the same time to distinguish the many authorities relied on by appellant. Some of these authorities are not accessible to the writer at this time, but none which has been examined at all conflicts with the views here presented, unless it be in a somewhat too comprehensive, if not extravagant, statement of the law in some of them as to the nonliability of a state for the wrongs and torts of its officers and agents. Why such authorities are not applicable here has already been shown, it is believed, and a detailed discussion of them would be tedious and useless.

"The contention that the state is liable in this case asserts nothing novel. Other states have owned railroads, canals, and other businesses, and have accepted the consequences of their ownership of the institutions and business, generally by statute, as in the case of Georgia with reference to its railroads, and of New York in reference to its canals. The decisions in those states show that they have assumed full liability for all such claims as we present here.

"The suggestion in appellant's argument that the ownership and operation of this railroad by the state constituted a part of the ordinary conduct of governmental affairs seems not to need extensive notice. It seems too plain to require comment that the manager and those in charge of this railroad were not engaged in the performance of duties to the state incident to the conduct of its penitentiaries and care for its convicts. Such an argument disregards all distinctions in government. The extent to which it might be carried is well pointed out in the opinion of the Supreme Court of the United States in the case of South Carolina v. United States, 199 U. S. 437 [26 Sup. Ct. 110, 50. L. Ed. 261, 4 Ann. Cas. 737]."

[5-8] Little else need be said. Since, in our view, liability of the state arose out of the facts, we are further of opinion that the action was not barred for the reason that limitation did not begin running in the state's favor until permission to sue it had been granted. Stanley v. Schwalby, 85 Tex. 349, 19 S. W. 264; Whatley v. Patten, 10 Tex. Civ. App. 83–84, 31 S. W. 60. If, however, it could be said that limitation did begin to run, no good reason occurs why the petition of appellee to the Legislature for the privilege of entering the courts with his cause of action, which under section 57 of article 3 of the Constitution he was required to give advance notice of for 30 days, and which he in fact presented within two years after his rights accrued, did not interrupt it. Stanley v. Schwalby, 147 U. S. 517, 13 Sup. Ct. 418, 37 L. Ed. 259. Moreover, no constitutional provision required the state to plead limitation as a defense; hence its Legislature was not without the power, through a measure of the character here involved to waive it, such an act being a forward-looking one, and not therefore under the ban interdicting ex post facto and retroactive statutes. O'Hara v. State, 112 N. Y. 146, 19 N. E. 659, 2 L. R. A. 603, 8 Am. St. Rep. 726; Davis v. Dawes, 4 Watts & S. (Pa.) 40; Lewis v. Turner, 40 Ga. 416.

If the state through her Legislature may grant the right to be sued, which has long since been well settled, it is not perceived why she may not also prescribe the conditions on which, and the procedure through which, that may be done. The statute here presented merely adopts an existing and familiar means of carrying out the purposes contemplated. If specific mention thereof had been omitted, leaving nothing but the bare right to sue, the same procedure would nevertheless have necessarily been followed.

No reversible error having been pointed out, all assignments are overruled and the judgment is affirmed.

Affirmed.