GIBBONS <i>v.</i> UNITED STATES.

1. In the Court of Claims the government is liable for refusing to receive and pay for what it has agreed to purchase.
2. When an individual who has been absolved from such a contract, by the refusal of the proper officer to receive the articles when tendered, afterwards consents to deliver them under a threat of the officer that he will withhold money justly due to the plaintiff, he can only recover the contract price, whatever may have been the current market value of the articles.
3. The government is not liable on an implied assumpsit, for the torts of its officer committed while in its service, and apparently for its benefit.
4. To admit such liability, would involve the government in all its operations, in embarrassments, losses, and difficulties, subversive of the public interest.
5. When the injury to individuals in such cases merits redress by the government, the remedy is with Congress.   The statute does not confer jurisdiction on the Court of Claims.

APPEAL from the Court of Claims.

The case as found by that court was thus:

Gibbons entered into a contract with the United States for the delivery of two hundred thousand bushels of oats within thirty days from the date of the contract.

He delivered a portion of the oats, and was ready and offered to deliver the residue within the thirty days, but was prevented by the officers of the United States from so doing; they would not receive it, because they had not convenient storehouses for it.

Subsequently to this refusal, the quartermaster having charge of the contract on the part of the United States, sent an "orderly" to Gibbons, requesting his immediate presence with the messenger at the quartermaster's office. This was understood by Gibbons to be an arrest. About the same time, notice was given to him, that he must deliver the residue of the oats specified in the contract under penalty of a purchase in open market; the difference of cost to be charged to him. The quartermaster at this time held a large sum of money in his hands, the price of grain before that time delivered. Gibbons remonstrated, contending that the contract was at an end. Influenced, however, by the above-mentioned assumption of power, and by the threats used, or by some reason, he did deliver the quantity of oats sufficient to make in all the amount specified in the contract.

By this time oats had advanced in price, and the price which Gibbons was compelled to pay in the market to get them, exceeded the amount paid to him by the government, as he alleged, $8\frac{3}{4}$ and 12 cents per bushel.

Gibbons was compelled to pay $333 demurrage on certain vessels which were laden with a portion of the oats, and which were detained by the government officers in receiving the cargoes.

On final settlement with the quartermaster, he was charged for 8000 bushels of oats purchased by the quartermaster in open market, after the expiration of the contract, at an advanced cost of 12 cents per bushel. This money was detained from him.

On this case, the Court of Claims,—upon the petition of Gibbons setting forth a claim for the difference, $8\frac{3}{4}$ and 12 cents per bushel, in the price of oats, delivered after the expiration of his contract, for demurrage, "for damages sustained by failure of the government to receive oats under contract at the time of delivery, $400," and for the money detained, but not alleging anything about duress,—thus announced its conclusions in law :

"The obligation on the part of the government under the contract to receive the oats when they were offered, was as

strong as the obligation to deliver. The plaintiff was not bound under a continuing obligation, and as he had made a reasonable offer, which was improperly refused, that put an end to the contract, and he was released from his obligation by the conduct of the government. The officers who threatened him had no authority to compel him to deliver the oats, and the threats used were superserviceable and improper. If he was so unwise as to submit to the unauthorized menaces of the quartermaster, he must take the consequences. Hence, he cannot recover the difference in price between that named in the contract, and that ruling in market after its expiration.

"Nor can the government withhold from the sum justly due to the plaintiff, any difference which was paid for oats purchased after the expiration of the contract exceeding the price fixed by it.

"Therefore, the plaintiff should recover the sum withheld at the time of settlement; also the demurrage."

Judgment being entered accordingly, Gibbons, claimant in the case, appealed to this court.

*Messrs. Reverdy Johnson and A. L. Merriman, for the appellant:*

The Court of Claims correctly decide that the obligation on the part of the government under the contract, to receive the oats when they were offered, was as strong as the obligation to deliver; that the plaintiff was not under a continuing obligation, and as he had made a reasonable offer, which was improperly refused, that put an end to the contract, and he was released from his obligation by the conduct of the government. It therefore seems to be clear, that in case of a delivery subsequently to the termination of the original contract, such delivery is under a new contract; and in case no express contract is made as to price, there would be an implied one to pay their market value at the time, unless there was an agreement to sell at the prices specified in the agreement then at an end.

In this case, no such agreement was made. On the contrary, the plaintiff insisted that the contract was at an end,

and the fact that he made the delivery of oats required under a supposed personal arrest, and under the threat of withholding the money due to him upon oats previously delivered, shows conclusively that there was no agreement to deliver the oats at the prices specified in the original contract, and rebuts any presumption of a voluntary delivery under its terms. The court below erred, therefore, in refusing to allow to the plaintiff, the market value of the oats so delivered, and in treating the payment by the government of the amounts specified in the contract before then terminated, as a full payment.

The court should have allowed him the value of the oats when sold and delivered, deducting therefrom, the amount paid by the government.

*Mr. Hoar, Attorney-General, and Mr. Talbot, contra:*

There was no error on the part of the Court of Claims, the conclusion of law stated in the first and principal paragraph of its opinion being entirely correct.

Besides the reason there given for refusing this allowance, is the additional reason that the facts found leave open to the appellate court, the inference that the whole matter had been voluntarily settled by a payment in full.*

Accordingly, the case should now be disposed of by a mandate to reverse the judgment and to dismiss the petition.

Mr. Justice MILLER delivered the opinion of the court.

The facts found by the Court of Claims show, that under the original contract between the plaintiff and the United States the plaintiff had delivered part of the 200,000 bushels of oats which he had agreed to deliver and had tendered the remainder, and that the quartermaster to whom they were properly tendered had refused to receive them. If the plaintiff suffered any loss by that refusal, he is entitled to recover for it in this action. But the only items of his account which

---

* United States *v.* Adams, 7 Wallace, 463.

refer to this part of the transaction were allowed to him by the court, except the claim of $400 damages for failure to accept the oats, and there is no evidence that he lost anything by this refusal. On the contrary, it appears that oats had risen in the market above the contract price, so that the presumption is that he was benefited instead of injured by the refusal of the officer to accept the oats when offered.

But after all this had passed and the time for delivering the oats had expired, the quartermaster in charge of the matter demanded of the plaintiff that he should still furnish the quantity of oats necessary, with what had been received, to complete the 200,000 bushels at the price stipulated in the original agreement. The plaintiff objected to this at first, but finally yielded and delivered the remainder of the oats.

Not content, however, with the price fixed by the contract, he now claims that oats had advanced in the market, and were worth, at the time of this latter delivery, 8¾ and 12 cents per bushel more than that price, and for the amount of this difference, with some other matters, he asks judgment.

It is very clear that but one contract was ever made in this case, and that the plaintiff was absolved from this by the refusal of the quartermaster to receive the oats when tendered. But, from whatever motive he may afterwards have consented to renew that agreement and proceed to its fulfilment, its terms were the same. If such pressure was brought to bear on him as would make the renewal of the contract void, as being obtained by duress, then there was no contract, and the proceeding was a tort for which the officer may have been personally liable. If the plaintiff's consent was voluntary, then the contract to which he assented was binding, and must control the case. The quartermaster treated the contract as still in force, and his demand on the plaintiff was made under that idea. In this he was wrong. But the plaintiff had his option to concur in this view and deliver the balance of the oats, or to refuse to deliver any more.

Though the Court of Claims finds that the plaintiff, when he consented to deliver, had gone to that officer's quarters in company with an orderly, which he considered as an arrest, the court does not find an arrest, nor the use of any force against his person. Nor does the petition of the plaintiff say anything about an arrest, or force, or duress. That he feared the officer might buy the oats in the market and hold back the difference in price from the money due for oats already delivered, does not invalidate the contract which he consented to fulfil to avoid that result. He could still have refused, and the government would have paid him what it owed him.

The supposition that the government will not pay its debts, or will not do justice, is not to be indulged. Still less can it be made the foundation for a claim of indemnity against loss incurred by an individual by acting on such a suggestion.

But it is not to be disguised that this case is an attempt, under the assumption of an implied contract, to make the government responsible for the unauthorized acts of its officer, those acts being in themselves torts. No government has ever held itself liable to individuals for the misfeasance, laches, or unauthorized exercise of power by its officers and agents.

In the language of Judge Story,* "it does not undertake to guarantee to any person the fidelity of any of the officers or agents whom it employs, since that would involve it in all its operations in endless embarrassments, and difficulties, and losses, which would be subversive of the public interests."†

The creation by act of Congress of a court in which the United States may be sued, presents a novel feature in our jurisprudence, though the act limits such suits to claims founded on contracts, express or implied, with certain unimportant exceptions. But in the exercise of this unaccus-

---

* Story on Agencies, § 319.

† United States *v.* Kirpatrick, 9 Wheaton, 720; Dox *v.* Postmaster-General, 1 Peters, 318; Conwell *v.* Voorhees, 13 Ohio, 523.

tomed jurisdiction, the courts are embarrassed by the necessary absence of precedent and settled principles by which the liability of the government may be determined. In a few adjudged cases where the United States was plaintiff, the defendants have been permitted to assert demands of various kinds by way of set-off, and these cases may afford useful guidance where they are in point. The cases of *United States* v. *Kirpatrick*,* and *Dox* v. *The Postmaster-General*,† are of this class, and establish the principle that even in regard to matters connected with the cause of action relied on by the United States, the government is not responsible for the laches, however gross, of its officers.‡

The language of the statutes which confer jurisdiction upon the Court of Claims, excludes by the strongest implication demands against the government founded on torts. The general principle which we have already stated as applicable to all governments, forbids, on a policy imposed by necessity, that they should hold themselves liable for unauthorized wrongs inflicted by their officers on the citizen, though occurring while engaged in the discharge of official duties.

In the absence of adjudged cases determining how far the government may be responsible on an implied assumpsit for acts which, though unauthorized, may have been done in its interest, and of which it may have received the benefit, the apparent hardships of many such cases present strong appeals to the courts to indemnify the suffering individual at the expense of the United States.

These reflections admonish us to be cautious that we do not permit the decisions of this court to become authority for the righting, in the Court of Claims, of all wrongs done to individuals by the officers of the General Government, though they may have been committed while serving that government, and in the belief that it was for its interest. In such cases, where it is proper for the nation to furnish a

---

* 9 Wheaton, 720.   † 1 Peters, 318.

‡ Nichols v. United States, 7 Wallace, 122.

remedy, Congress has wisely reserved the matter for its own determination.    It certainly has not conferred it on the Court of Claims.

JUDGMENT AFFIRMED.