Davis, J.,
delivered the opinion of the court:
The contract in issue in this case provided for the delivery to the Government, at plaintiff’s quarry, of riprap, intended for *351 use in the improvement of the Lower Mississippi. An abstract of the contract may thus be stated:
Plaintiff was to furnish the riprap as called for, and was to furnish all the stone prior to July 1. He was to take care of the Government barges which called at his quarry for the stone and was to load them. Having complied with these conditions, he became entitled to his pay of 55 cents per cubic yard.
The principal duty imposed by the contract upon defendants, aside from that of payment, was to furnish the barges. This they did not do; and upon July 1 plaintiff, through no fault of his, but entirely from the failure on defendants’ part to produce barges at his quarries, had delivered only about one-half' the stone.
At the end of the contract period (July 1, 1883) plaintiff refused to deliver more stone, claiming that his contract had ended; but the engineer officer in charge, in the exercise of that careful protection of the Government’s interests which traditionally has characterized his corps, asked him to proceed under a certain personal assurance of protection.
The Engineer Bureau inWashington differed from the plaint-. iff, and held the contract to be a continuing one. They refused any compensation to plaintiff for delay, and refused any arrangement for the future other than that before in force. Plaintiff protested against this decision, but did furnish, still v under protest, the remainder of the stone, and was paid therefor the contract rate. The last delivery of riprap was in December, 1883, one year after the contract was signed.
Was the delivery of stone to continue over an indefinite period, as in substance contended by the Engineer Bureau, or was plaintiff to deliver 70,000 cubic yards of stone in such quantities as might from time to time be called for, but all to be called for before July 1, as contended by him ? It may be noted here that no point is made as to the regularity or irregularity of call under the clause fixing the monthly allotments.
The specifications annexed to the contract state—
“ That barges will be supplied and towed to and from the points where the stone is loaded by the United States; the quantity to be supplied will be about 12,000 cubic yards per month, beginning about January 2, 1883, navigation permitting. The total quantity required will be about 70,000 cubic yards, with the privilege of taking up to 100,000 cubic yards at the same rates. All to be taken up by June 30, 1883.”
*352 Although annexed to the contract as “ specifications ” or “instructions,” this document appears, from its context, to have been prepared before the contract for the information of bidders. The contract states that it was made in conformity with these “ specifications.” Its first clause, after the recital, provides that plaintiff shall deliver—
“Upon barges supplied by defendant, riprap rock, as follows : 5,000 cubic yards in January, 1S83; and 13,000 cubic yards in each of the months of February, March, April, May, and June, 1883, providing navigation will permit the barges to reach the quarry; othenvise, lesser quantities will be furnished monthly. Total quantity to be delivered between January 1 and June 30,1883, is 70,000 cubic yards.”
Further on we find defendants agreeing to supply—
“ Good, serviceable barges as fast as they can be unloaded, but does not guaranty to keep the [plaintiff] supplied with barges at all times, nor does he [Captain Sears] guaranty to take 7,000 cubic yai’ds a month; but he does agree to use his best efforts to supply barges to take stone as fast as possible, and to take the whole 70,000 cubic yards by June 30, 1883, navigation permitting, and, if not, as soon thereafter as possible.”
Again:
“ The said [plaintiff] shall commence the delivery of the rip-rap rock, as specified, on or before the 10th day of January, 1883, and shall complete the said delivery on or before the 30th day of June, 1883, providing the party of the first part can supply barges sufficient to remove it.”
Such are the clauses of this instrument which immediately affect the issue before us. A careful reading of the whole contract shows it to have been prepared in the interest of the Government; the plaintiff receives his pay and is to be furnished barges; otherwise the principal burden very properly is upon him. The barges were furnished in such absolutely insufficient number, that by July 1 less than one-half of the stone had been removed.
We do not agree with the construction put upon this contract by the Engineer Bureau. They laid stress upon certain phrases of the instrument which, disconnected from the context, might support the result they reach. Taking the instrument as a whole,- however, it will be seen that the defendants specifically bound themselves to take all the stone by July 1. There was allowed to them certain elasticity as to the various takings, but everywhere we find the one fact fixed, that prior to July 1 *353 all the stone was to be taken. Defendants distinctly pledged themselves to.two things: to take all the stone within the contract period and to pay for it at the contract rate. “ Navigation permitting ” is the only limiting clause upon this part of the agreement; this means “navigation” permitting at the point of loading, and “ navigation ” there did not impede the fulfillment of the contract.
Plaintiff did not agree to hold himself ready for an unlimited period to furnish stone in any amount the Government might ask with the one limit of 70,000 cubic yards. It is not reasonable te suppose that his entire plant, his'men, and boats were to indefinitely await the pleasure and convenience of defendant’s officers. Nearly six months elapsed after the contract period before that amount was called for; a delay not explainable upon any theory of “ days of grace ^ or elasticity in time.
The engineer office relied largely upon the single clause in the contract that barges should be supplied as fast as they could be unloaded, and holding that the barges could not be unloaded faster than they were, then reached the result that plaintiff must be ready to deliver at once, until the United States ceased to care to take it, provided that, at some period,the 70,000 yards were taken. Such an interpretation proceeds upon the assumption that some definite number of barges was to be used in carrying away this stone; no number of barges is named in the contract, and, to push this argument to its logical result, defendants might have used two barges, the lowest number which fulfils the contract demand of the plural, and have held the plaintiff at their command until these barges could have loaded and unloaded all the stone. The reasonable and fair interpretation of the contract is, that defendants were to furnish sufficient barges to take away all’ the stone by about July 1, and that the single phrase “ as fast as they can be unloaded ” refers simply to the regularity of call for the stone. It will be noted, in support of this position, that the same paragraph in which this phrase occurs closes with the provision that all the stone shall be taken by June 30, 1883.
We think plaintiff correct in his contention that it was his right upon July 1 to consider the contract at an end.
After signifying this decision and after receiving the Engineer Bureau’s adverse decision he continued to deliver stone and to receive payment for it at the contract rates, giving receipts for *354 these payments. There has been some argument as to the effect of these receipts : but we do' not attach much importance to their form. They were “ in full payment of the above account,” but in no sense “ in full ” of all other and different demands upon the Government. Continuing to furnish stone at 55 cents per yard, plaintiff was paid at thatrate, and receipted at that rate as 11 in full ” for the stone from time to time furnished in the amounts stated in the receipts. He receipted in full for the iC above account,” but the u above account ” was merely an account of the last deliveries of stone>
It is urged that he should have made a tender of the stone. To this a sufficient answer is found in the fact that he was always able and ready to fulfill his contract, and defendants knew it. It would be most unreasonable to suppose that he should have quarried and ready on the river-bank the total amount of stone remaining undelivered.
That Captain Seal's did all in his power to furnish barges is not an excuse for defendants. High water in the Lower Mississippi was an element to be contended against, but the careful provision against loss to them by low water in the Ohio shows the Government not to have been unmindful of possible changes in the water stage when they spoke of “ navigation permitting.” Captain Sears’s efforts may have been counteracted by lack of co-operation elsewhere or by failure of Congress to furnish funds. All this is speculative; but if true affords no excuse, for the United States is bound to fulfill its agreements as is any other-contractor.
In Gibbonh Case (8 Wall. p. 269) plaintiff had a contract for oats, part of which he delivered and the remainder of which he properly tendered, meeting with a refusal to accept. After the contract time for delivering had passed he was called upon to furnish the quantity of oats necessary, with what had been received, to complete the amount stated in the contract, and he furnished that quantity. The Supreme Court held that he was entitled to recover for any loss he suffered by the refusal to receive the balance due within the contract time, and they further held:
“ It was very clear that but one contract was ever made in this case, and that plaintiff was absolved from this by the refusal of the quartermaster to receive the oats when tendered. But, from whatever motive he may afterward have consented to renew that agreement and proceed to its fulfillment, its- *355 terms were the same. If suca pressure was brought to bear on him as would make the renewal of the contract void, as being obtained by duress, then there was no contract, and the proceeding was a tort, for which the oiileer may have been personally liable. If plaintiff’s consent was voluntary, then the contract to which he assented was binding, and must control the case. The quartermaster treated the contract as still in force, and his demand on plaintiff was made under that idea. In this he was wrong. But plaintiff had his option to concur in this view and deliver the balance of the oats or to refuse to deliver any more.”
In the case at bar there is no suspicion of duress, and it completely falls within the principle thus announced. It would be difficult to 11 ud two cases more alike. Plaintiff, then, is entitled to recover the loss he suffered by the Government’s failure to fulfill its share of the contract, and nothing more.
Plaintiff had made large expenditures upon his quarry and its surroundings. Some of these expenditures were unnecessary under the circumstances, and could have been saved had it not been for his endeavor to be in readiness to deliver the full amount of stone within the contract period. Other expenditures contributed to the value of his property, and were-not lost to him; if he had continued to own the property,they would have aided in the fulfillment of all future contracts; they did aid in furnishing the rock called for after July 1. The fact that he sold the quarry does not complicate this branch of the-question; for if he held,it he had the advantage of the plant in increased facilities for work; if he sold it, he presumably had the advantage of the plant in the increased value of his quarry..
The rule seems to be that plaintiff is entitled in a case of' this kind to the actual extra outlay imposed upon him by defendant’s default, and which was made m an endeavor to fulfill Ms contract obligation. This we find to be $3,200.
In addition he is entitled to the direct profit which he lost. Had he furnished the stone prior to July 1, his profit per cubic yard would have been 121 cents; furnishing it after July 1, his profit was 10 cents per cubic yard. This difference of 2¿ cents per cubic yard upon the amount of stone uncalled for at the expiration of the contract period we think he should receive. (P., W. & B. R. R. v. Howard, 13 How. 307; Masterton v. Mayor of Brooklyn, 7 Hill, 61; Fox v. Harding, 7 Cush., 516.) It amounts to $897.
Judgment will be entered for $1,097.