## STATE OF SOUTH DAKOTA v. FIMAN.

District Court, D. South Dakota.   September 2, 1927.

Buell F. Jones, Atty. Gen., and Martens & Goldsmith, of Pierre, S. D., for State of South Dakota.

Fuller & Robinson, of Pierre, S. D., for defendant.

ELLIOTT, District Judge.   I have resolved the issues in re State of South Dakota, plaintiff, v. Chas. F. Fiman, as receiver, etc., in favor of the plaintiff and against the defendant.

The plaintiff seeks by this action to establish a trust ex maleficio in rural credit moneys alleged to belong to the plaintiff, deposited by it in the National Bank of Commerce of Pierre, S. D., in excess of the limit fixed by statute for such deposits.   The defendant receiver in his answer admits, in substance, that the moneys of the plaintiff were deposited in the bank in violation of the provisions of the Rural Credit Law of the state of South Dakota limiting such deposits to 40 per cent. of the capital and surplus of the depository bank, and also further limiting such deposit to the amount of security for such deposits furnished, and seeks to avoid responsibility in this action, and alleges that the state is estopped, by reason of the knowledge and acts of its officers, to assert this cause of action and claim a trust against general creditors and depositors of the said bank.

Then follows numerous allegations covering the history of the administration of the rural credit board under the laws of the state of South Dakota, which, in substance, allege notice to public officials of these excess deposits, and that they were approved and ratified by said officials, and other creditors and depositors credited the National Bank of Commerce innocently and to their prejudice in ignorance of the facts, and as against these depositors the plaintiff's claim to a trust is without equity.

While counsel have presented the contention of the defendant with painstaking care, at great length, under eight separate and distinct headings, they are all involved in the consideration of such defense.   The facts are undisputed.   There is controversy between counsel as to the exact amount established by plaintiff, but the testimony of the expert accountant reasonably sustains the claim of the plaintiff.   Plaintiff sought to recover the sum of $616,000, deposited by Ewert, treasurer of the South Dakota rural credit board, in violation of the 40 per cent. limitation of the statute, over and above the amount of the bond furnished by the bank while said treasurer was the president and managing officer of the National Bank of Commerce in which

the funds were deposited. Plaintiff relies upon section 10170, of the 1919 Code of South Dakota, in substance, that the maximum amount deposited in any bank "shall in no case be fixed at more than 40 per cent. of the paid-up capital and surplus of such bank. * * *" The record discloses without dispute that there was in excess of $416,000 deposited in violation of this statute, and over and above the amount of the bond furnished by the bank, and I have no difficulty in determining that plaintiff has established by definite, certain testimony that the moneys and funds in the National Bank of Commerce and its correspondent banks, were augmented, increased, and at the time of the taking possession thereof by the receiver, were identified in the sum of only $263,093.21. This sum plaintiff now urges the right to recover, and it abandons the efforts to trace funds going into other assets of the institution, the funds wrongfully converted by Ewert, treasurer, for the benefit of himself. Neither does the plaintiff seek to impress any other assets of the bank, and by stipulation between the parties, $263,093.21, has been retained by the receiver and set aside as a special fund pending the result of this action.

The circumstances under which these deposits were made is clear. By chapter 233 of the Session Laws of 1915 there was submitted to the people of the state of South Dakota at the general election of 1916, an amendment to the Constitution which was duly adopted and which provided, in substance, that the state may establish and maintain a system of rural credits, and which provision was incorporated into section 1, article 13, of the Constitution. Chapter 163 of the Laws of 1917, provided for the submission of a proposal for the amendment of said article at the general election of 1918, which was adopted, and provided among other things:

"For the purpose of developing the resources and improving the economic facilities of South Dakota, the state may engage in works of internal improvement, may own and conduct proper business enterprises, may loan or give its credit to, or in aid of, any association, or corporation, and may become the owner of the capital stock of corporations, organized for such purposes. * * * The state * * * may establish and maintain a system of rural credits and thereby loan money and extend credit to the people of the state upon real estate security in such manner and upon such terms and conditions as may be prescribed by general law."

Pursuant to this amendment chapter 333 of the Session Laws of 1917 was adopted. Rev. Code 1919, § 10150 and subsequent sections. This act in substance created and established a rural credit system in the state of South Dakota to be controlled and managed by the "South Dakota rural credit board," provision being made that such board should have charge of the execution of the act and amendments thereto, and that a system of rural credits should be established and maintained. Provision was therein made that such rural credit board should consist of five members, the Governor of the state to be ex officio president of the board, and four members to be appointed by the Governor, the Governor being given supervising authority with power to remove any member of the board at any time for failure to efficiently attend the duties of his office. One member was designated "commissioner," another "treasurer." There were provisions in this act controlling the issuance of bonds in the name of the state by which money should be secured to make loans, and also conditions prescribed for the making of the loans on farm lands, only, at a rate of interest from one-half of 1 per cent. to 1½ per cent. more than the rate of interest payable by the state on the bonds of the state sold to raise the funds to be loaned. Section 22 (R. C. 1919, § 10170) provides the manner and place of depositing the funds of the state of South Dakota provided for this purpose. In substance, it provides that the rural credit board shall designate such banks of depository within the state as it may deem necessary to receive the deposits of the funds and fix the maximum amount that may be deposited in each. It is therein provided that such maximum shall in no case be fixed at more than 40 per cent. of the paid-up capital and surplus of such bank, and it is provided that the board shall require such banks, except state banks, to give bonds for the safe-keeping and return of the deposits, the bond thus required not to be less than the amount of the deposit, and the treasurer of the board is by this statute specifically prohibited from making any deposit in any bank required to give bond before such bond has been given and approved by the board. There are other general provisions that do not seem involved here.

Pursuant to this constitutional provision and the statutes thereafter enacted the rural credit board of the state of South Dakota was on the 1st day of June, 1917, duly organized. Hon. Peter Norbeck was then Governor, and A. W. Ewert, president of the National Bank of Commerce, Pierre, S. D., was made a member of the board, and was treas-

urer of the board. He continued in that position from that date until the said bank suspended operations February 4, 1925, and also during all of that time continued as president and managing officer of said bank. June 28, 1917, said bank was, by resolution of said board, designated "to receive funds of the board not to exceed the amount of 40 per cent. of the capital and surplus of said bank," which resolution also contained the provisions "that the deposit shall not exceed the amount of the bond approved by the board, and that the rate of interest shall be 2 per cent. on daily balances." The capital stock of the said bank at that time was $100,000, with small surplus, and with no surplus for more than two years prior to its suspension. The said bank pursuant to this resolution furnished security for said deposits in the sum of $25,000, which bond continued in force until February 21, 1924, and thereupon the liability of this bond terminated and the deposits in said bank were thereafter without security. It seems that upon the organization of the rural credit board and the designation of said bank as one of its depositories, the said treasurer opened deposit accounts in said bank, designated them as "General Account" and "Collection Account," and these accounts were used indiscriminately, with no distinction in the nature or character of items deposited therein, or in the use of the funds in said accounts.

Complying with the provisions of said statute the said bank made monthly reports to said board of deposits, withdrawals, and daily balances in said bank, and the record discloses that from the very first the deposits and balances so reported to the board were largely in excess of the amount of $25,000 security and such deposits and balances greatly exceeded 40 per cent. of the capital and surplus of said bank. This system of reports was also furnished the executive accountant, and officer of the state government, at the end of each month, containing a written report accounting for the moneys of the rural credit board and the amount of said moneys deposited in the various depository banks of the state. These reports were made from February, 1918, until December, 1924, covering a period of nearly seven years, and during all of this time such deposits and balances were always in excess of the amount of security furnished. A duplicate of these reports of the rural credit board to the executive accountant was filed each month in the office of the Governor as a record of that office. The practice of overdepositing funds in said bank began in the fall of 1917 and continued until the spring of 1925, and it is conclusively shown that this practice was within the knowledge of the rural credit board, the executive accountant and the Governor of the state and others.

The record discloses that in the years 1920 and 1921, and up to the time of the suspension of the said bank, a financial depression obtained throughout the entire state and a policy or practice was adopted and pursued by the said rural credit board whereby they issued and sold bonds and deposited the moneys throughout the various banks of the state in an effort to prevent the failure of said banks and the consequent financial panic. The record further discloses that this practice was approved by some, criticized by others publicly; political parties in 1921 and 1922, by resolution approved or criticized such practice, and officers of the government referred to the same publicly, and a general discussion of the practice was indulged throughout the state. It is also shown that during the session of the Legislature of South Dakota in 1923, an auditing committee of the House and Senate, acting with the executive accountant, made its audit and report of the South Dakota rural credit board, and found that: "For some period of time deposits in excess of 40 per cent. of the capital and surplus of such banks were made; in the case of some national banks deposits were made in excess of the amounts of their surety bonds." This committee commended the efficiency and successful management of rural credit loans under "the present system."

It is clear that it was the intent and purpose of counsel for defendant here to show that this board from the time of its inauguration consistently ignored the statutory limit of 40 per cent. in the deposit of rural credit funds in the bank, and it ignored the other provision as to depositing funds in excess of the security given, and that this was done with knowledge of the state at large, of its officers, and of the Legislature, and that the amount was at all times so large that it exceeded the total of this bank's cash resources, exclusive of reserve, and it is conceded that the amount of such deposits practically all of the time was largely in excess of all cash in the vault and in correspondent banks, including the reserve. It is impossible to go into detail in this statement, but the record discloses that some $60,000,000 in these funds were deposited in this bank during a period of a little less than seven years, constituting a daily deposit and checking amounting to about $1,000,000 a month, with only $25,000 security to the spring of 1924, and with no

security thereafter, 40 per cent. of the capital and surplus of said bank being $40,000. These facts result in the proposition, conceded by all parties to this action, that $60,000,000 passed through said bank in technical violation of this statute.

The foregoing outline is not intended to include the details, nor was it my purpose to give more than a general outline of the situation that is conceded by the record here to exist. It is not my purpose to go into exhaustive treatise upon the question of estoppel applicable to the facts presented here. Rather, I would state a few propositions of law that appeal to me as elementary, without citation to sustain them, but having in view the exhaustive briefs of both parties.

█ We start, then, with the proposition that the record discloses that the plaintiff has traced to the possession of the defendant of the excess deposits thus illegally deposited in said bank, the sum of $263,093.21. It is conceded that A. W. Ewert, treasurer of said board, illegally deposited these funds in his own bank, of which he was president and managing officer, in violation of the direct, mandatory provisions of the statutes of the state of South Dakota above referred to; that the said bank was an active participant in the wrong, and it follows that as to these excess deposits in that sum the bank became a trustee ex maleficio, for the use and benefit of the plaintiff, which may be followed by plaintiff and taken in preference to other creditors.

In addition to the statutory provisions above stated section 10167 of the Revised Code, provides that mortgages, promissory notes and other evidence of indebtedness, title to real estate and other property acquired by said board, shall be held in trust for the payment of money borrowed by this state for the purpose of establishing and maintaining such system of rural credits, and shall never be diverted to any other purpose. The Supreme Court of the state of South Dakota in re Opinion of Judges (1925) 48 S. D. 253, 203 N. W. 462, holds: "So far as the rural credit board and its officers are concerned, rural credit funds are trust funds to be administered according to the legislative will." And I may add, that it is my opinion that when these excess public funds were deposited by the treasurer of this board in said bank, having knowledge of the facts, the title thereto did not pass and the trust ex maleficio resulted, which may be enforced against the receiver of this insolvent bank.

The Supreme Court of the state of South Dakota in State v. Ewert, 45 S. D. 550, 189 N. W. 522, declares that: "We are of the opinion that the safety of the public funds was the motive controlling the Legislature when it enacted the 40 per cent. limitation." Following this line of thought by the Supreme Court of the state, I am of the opinion that a constructive trust arose when the said bank unlawfully and wrongfully took possession of and assumed control of these excess deposits belonging to the state of South Dakota. It has been held, I think rightly, that such public moneys wrongfully deposited by state officers, constitute a trust fund and in case of the insolvency of the bank its receiver must treat such funds as the property of the true owner, in this case the plaintiff, the state of South Dakota, and not of the bank. It is undisputed that the plaintiff has established the identity of its funds to the extent of the sum above named by adopting the amount found at any one time in the account of the National Bank of Commerce, in its correspondent banks during the period involved, and tracing the funds of the rural credit board into and out of such account, leaving a balance on hand in the correspondent banks standing to the credit of the National Bank of Commerce, the funds identified as rural credit moneys, the proof complying technically with the doctrine announced in Knatchbull v. Hallet, in re Hallet's Estate, 13 Ch. D. 696, the courts of the United States and especially of the Eighth Circuit, having adopted and followed this rule.

█ Counsel for defendant urges that the act of making the excess deposits involves nothing except the excess of power as exercised by the officers of the board; that the deposit was not wrong in itself because no loss to the state necessarily follows such deposit, and in that connection also urges that numerous officials and bodies other than the treasurer of the rural credit board, who had knowledge of these deposits, were vested with power to discontinue the same. That this case does not involve hidden or concealed instances of single deposits, but was a practice of long standing and public knowledge; that there was a consideration and benefit in the practice to the rural credit board, and that the amount of the excess deposits remaining a trust were sufficient to deceive and prejudice innocent third persons dealing with the bank; that this case does not involve laws relating to official conduct in the field of governmental action. These, with inferences naturally to be drawn therefrom, constitute the basis for the contention of the defendant that the plaintiff is estopped notwithstanding the general rule constituting excess deposits a trust ex maleficio.

It seems to me a sufficient answer to all of these objections is the elementary rule of law that the state cannot be estopped by unauthorized, illegal, or fraudulent acts, any more than the state, through its officers, can ratify such unauthorized, wrongful, or illegal acts. I think it is well settled that the state cannot be estopped by the unauthorized or fraudulent acts of its agents or officers, or their mistakes. The decisions are so uniform that it does not seem possible in the case at bar that an exception shall be created for the benefit of this defendant in the jurisprudence of this jurisdiction, depriving the people of the state of the moneys which belong to them, under the statutes of the state, by virtue of which it was held by the treasurer of the board, taken from the people of the state by a dishonest officer, used for the benefit of the National Bank of Commerce illegally, contrary to the express provisions of the statutes, all of which was known to the bank, and in direct violation of an express mandate of the Supreme Court of the state of South Dakota in an action brought against Ewert by the then Attorney General. The law of the state of South Dakota expressly prohibited the treasurer and board from depositing moneys in excess of the 40 per cent. limitation, and in excess of the $25,000 bond, both of which he disregarded. The record discloses that a peremptory writ of prohibition by the Supreme Court of South Dakota required the said Ewert to observe the 40 per cent. limitation, in re State ex rel. Payne v. Ewert, 45 S. D. 550, 189 N. W. 522, and notwithstanding this writ the said treasurer and the said bank continued the illegal practice.

My understanding of the doctrine of estoppel is that it can never be invoked where the party, whether an individual, a corporation, or a government, against whom it is asserted, has no power or legal capacity to lawfully or directly do the act which is sought to be confirmed by precluding its denial. It is an essential element of the legal principle upon which the doctrine of estoppel rests that the party against whom it is asserted should have possessed the authority or power or legal capacity to have directly done the act in some legal way. In the case at bar it was not within the power or legal capacity of the state, of the citizenship of the state, or of any official or officials of the state to misappropriate these rural credit funds of the state. The rural credit funds were the property of the state of South Dakota; with these funds the rural credit board, including the treasurer of the board, had nothing to do except to administer them in strict conformity with the provisions of the laws of the state of South Dakota.

Admit, if you please, that the Governor and the members of the board and various people throughout the state of influence, political and otherwise, had knowledge of this, such knowledge as made all parties to it, they thereby became participants in the tort with no power to make it legal, and the fact, if it is a fact, that they entered into the active wrongdoing, adds nothing to its legality, nor does it deprive or tend to deprive the plaintiff of title to its property, and this is true regardless of the character of the business that was involved, whether private or governmental. It must be conceded that the title to this money was in the state of South Dakota; that title could be divested only by a compliance with the provisions of the statutes of the state. No one, high or low, had any authority to misappropriate any of those funds, nor to use them or handle them in direct violation of the plain provisions of the statutes of the state, and the knowledge of the officers of the state, or of individuals of the state, and participation by those officers and individuals in the wrong, would in no way validate the act, and they have no power to ratify, approve, or estop the state without the power of control or performance upon their own part.

Whether the transaction of this business is a private or governmental function the state does not hold itself liable to individuals for the misfeasance, laches or unauthorized exercise of power by its officers and agents. It does not undertake to guarantee to any person the fidelity of any of the officers or agents whom it employs, since that would involve it in all of its operations in endless embarrassments and difficulties and losses which would be subversive of the public interests. Gibbons v. U. S., 8 Wall. 269, 19 L. Ed. 453.

Individuals as well as courts take notice of the extent of authority conferred by law upon the person acting in an official capacity, and the rule applied in such a case that ignorance of the law furnishes no excuse for any mistake or wrongful act. Torts committed by an officer in the service of the United States do not render the government liable in an implied assumpsit, even though the acts were done apparently for the public benefit. Whiteside v. U. S., 93 U. S. 247, 23 L. Ed. 882, and citations.

Defendant emphasizes the course of dealing in the making of these excessive deposits in the National Bank of Commerce, the length of time covered by the deposits, the long continued practice, the general knowledge, offi-

cial and personal, the apparent approval by the Governor and legislative committees, general discussion with reference thereto, all take this case out of the ordinary, and that exception should be made and the doctrine of estoppel applied. These transactions were wrongful, unlawful, unauthorized, prohibited, and illegal, and the fact that this illegality in this unlawful proceeding continued for a great length of time is not an element of estoppel that can be applied to the citizenship of a state. This action on the part of these officials could not be ratified or approved by any one. An attempt upon the part of the Governor or other officer to usurp the power to approve or ratify would have made such person a party to the wrong, and in no way binding upon the citizenship of the state.

These terms, "sanction," "ratification," and "approval" are for practical purposes synonymous, and neither can be accomplished unless at the time of ratifying, approving, or sanctioning the act done, the person so acting has power to confer authority for such act. Concededly no officer of the state, no committee, no citizen nor class of citizens, had such power, and, I repeat, the acts of omission or commission by officers of the state added nothing to and detracted nothing from the illegality of the excess deposits. I am of the opinion that, regardless of whether the care of these funds of the state was connected with private industry or govenmental function, they were still moneys the title to which was in the state of South Dakota, and the state cannot be estopped by any act of its agents whether of commission or omission, which are wrongful, unauthorized, unlawful, and in direct violation of a specific statute of the state. The state may be estopped by acts of its officers within the scope of their authority, but never by their wrongful, unlawful, unauthorized acts.

I have reviewed the exhaustive analysis from various viewpoints presented to me by counsel for defendant, and I find that the various positions, respectively, are in conflict with what I deem the well-settled law applicable under the circumstances presented. I can find no warrant for making this defendant an exception to the general rules because of the peculiar circumstances. The ownership of the fund by the state, the specific provisions of the statute enacted pursuant to the amendment to the Constitution, and the violation of those specific provisions of the statutes, in the manner above set forth, create the trust urged by plaintiff, and it is entitled to judgment accordingly.

■ This makes it unnecessary to pass upon the question as to whether or not the plaintiff, state of South Dakota, may recover this money as a preference in this case in the exercise of its sovereign prerogative to recover as a preference its trust funds. I may add, however, in passing, that my understanding is that the state has not established any right to preference by legislative enactment. There is a provision of our Code (Rev. Code 1919, § 3), however, which provides that: "In this state the rules of the common law, including the rules of the law merchant, are enforced except where they conflict with the will of the sovereign power. * * *"

In Marshall v. New York, 254 U. S. 380, 41 S. Ct. 143, 65 L. Ed. 315, it is said, "At common law the crown of Great Britain, by virtue of a prerogative right, had priority over all subjects for the payment out of a debtor's property of all debts due it."

It is held with authority that the people of the state of South Dakota by adopting the common law where the same does not conflict with the state statutes, have succeeded to the prerogative rights of the British crown. (This, as I understand it, does not extend to the United States.)

I have examined with interest the case of U. S. Fidelity & Guaranty Co. v. Bramwell, 108 Or. 261, 217 P. 332, 32 A. L. R. 829, which makes distinction in the application of the rule to the United States government and to the various state governments. A review of this case and citations emphasizes the rule of law that every state in the Union possesses all of the powers of sovereignty not delegated to the Federal Constitution. United States District Judge Borquin in re American Bonding Co. of Baltimore v. Reynolds (D. C.) 203 F. 356, analyzes the common-law rule and discusses its applicability to the situation as it existed in Montana with a statute similar to our own. Under the rule announced in this decision and equally applicable here, the state of South Dakota may, in this action, enforce this preference as to this trust fund in the exercise of its sovereign prerogative.

You may, therefore, prepare and forward proper judgment, with an exception to the defendant.