## FIMAN et al. v. STATE OF SOUTH DAKOTA.*

Circuit Court of Appeals, Eighth Circuit.
November 7, 1928.

No. 8116.

*Certiorari denied 49 S. Ct. 254, 73 L. Ed. ——.

For opinion below, see 29 F.(2d) 770.

Howard G. Fuller, of Pierre, S. D. (Will G. Robinson, of Pierre, S. D., on the brief), for appellants.

E. D. Roberts and Benjamin D. Mintener, both of Pierre, S. D. (Buell F. Jones, of Britton, S. D., on the brief), for the State of South Dakota.

Before BOOTH, Circuit Judge, and POLLOCK and DEWEY, District Judges.

DEWEY, District Judge. The National Bank of Commerce of Pierre, S. D., was taken over by the Comptroller of the Treasury for liquidation on the 4th day of February, 1925, and appellant, hereinafter referred to as the defendant, was appointed receiver.

At the time of the closing of the bank the state of South Dakota had on deposit therein the sum of $414,055.61 and had negotiable paper of the bank for an additional $211,-431.59. It brought an independent action in equity and established as determined by the trial court that the funds so deposited were trust funds and that it had identified and traced $263,093.21 into the hands of the receiver.

The claim of the state of South Dakota was based upon the theory that all of the deposits in said bank were illegally deposited by the rural credit board of that state. In asking for relief the state claimed that it was entitled to a "preference."

It is perhaps inaccurate to use the term "preferred claim," when an effort is being made to secure from the possession of a re-ceiver certain funds which are sought to be recovered as a trust fund. The same confusion has entered into the decisions, and in this case the inaccuracy of the term employed has prompted the state to claim that under its pleadings, it is entitled to have the question determined whether it is entitled to recover as a sovereign state.

The case was tried, however, upon the theory set out in plaintiff's complaint that the state was entitled to recover trust funds in the hands of the receiver. And from this position and theory of trial the plaintiff does not appeal. It must be concluded that the plaintiff elected to try its action on a trust theory and is not entitled to claim on appeal a right to a preference in distribution. Equitable Trust Co. v. Brass & Manufacturing Corp. et al. (C. C. A.) 290 F. 712, 724; Marshall v. New York, 254 U. S. 380, 41 S. Ct. 143, 65 L. Ed. 315, 317.

On account of the suggestion of the trial court, however, in its opinion [29 F.(2d) 770], that the plaintiff is probably entitled to recover as a prior claim in its sovereign capacity, and the arguments of plaintiff, perhaps the question should further be disposed of by this court.

The state of South Dakota having adopted the common law of England, under a rule of this district, is entitled to have priority of payment of all debts due it out of a debtor's property. City of Denver v. Stenger (C. C. A.) 295 F. 809.

No case, however, is cited where this rule is applicable to a settlement in the distribution of the assets of a National Bank. The National Bank Act (12 USCA §§ 21–200) provides for a ratable distribution of the assets of an insolvent national bank, constitutes a complete code of laws for the organization, control, and dissolution of national banks and the manner of payment of their debts, and even a federal statute, general in nature, providing for prior payments of debts due the United States is not effective as against its provisions. Cook County National Bank v. U. S., 107 U. S. 445, 2 S. Ct. 561, 27 L. Ed. 537; Davis v. Elmira Savings Bank, 161 U. S. 275, 16 S. Ct. 502, 40 L. Ed. 700; U. S. v. State Bank, 6 Pet. 29, 8 L. Ed. 308; Empire State Surety Co. v. Carroll County (C. C. A.) 194 F. 603.

United States statutes having provided the exclusive method and manner of distributing the assets of an insolvent national bank, such statutory provisions are necessarily superior to a claimed right of a state to a preference by reason of its common law. First National Bank v. California, 262 U. S.

366, 43 S. Ct. 602, 67 L. Ed. 1030; McClellan v. Chipman, 164 U. S. 347, 17 S. Ct. 85, 41 L. Ed. 461; Easton v. Iowa, 188 U. S. 220, 23 S. Ct. 288, 47 L. Ed. 452; Yates v. Jones National Bank, 206 U. S. 158, 178, 27 S. Ct. 638, 51 L. Ed. 1002.

The plaintiff based its claim upon the fact that at the time of the closing of the bank it had on deposit therein the sum of $616,707.18, although there were outstanding cashier's checks and drafts which reduced the deposit as shown by the books to $414,055.61; that these funds belonged to the state of South Dakota as the proceeds from the sale of bonds, were illegally deposited, increased and augmented the funds of the bank, and a part thereof has been traced into the funds of the bank carried as cash or cash items in its own vault and a part into the accounts of correspondent banks.

In 1917 under and by virtue of the Constitution of the state of South Dakota the Legislature of that state enacted certain laws found in chapter 333 of the Session Laws of the state for the year 1917, and amendments thereto, intending to promote and aid, among other things, the agricultural industry of the state. These laws provided for the establishment of a rural credit board consisting of the Governor of the state and four members to be appointed by the Governor. A. W. Ewert was treasurer of the rural credit board from the time of its inception until the closing of the National Bank of Commerce of Pierre, S. D. He was also during this time president of this bank.

This act, among other things, provided that the rural credit board should have authority to issue and sell state bonds for the purpose of raising funds to make loans to be secured by real estate mortgages and at a rate of interest from 1 to 1½ per cent. higher than the interest paid on the bonds. The act also provided that the rural credit board should designate depositories to conserve the rural credit board funds, and that no deposit should be made in any bank of an amount in excess of 40 per cent. of the paid-in capital and surplus of such bank and that such depository should execute a bond to cover the deposits so made.

The National Bank of Commerce of Pierre, S. D., was designated as one of its depositories, and from the year 1917 until the bank closed, large sums of money were deposited by said credit board in said bank.

The combined capital and surplus of the National Bank of Commerce at no time exceeded $110,000, so that all deposits by the board in that bank in excess of the sum of $44,000 were unlawful and illegal as being an express violation of the statutes of the state prohibiting deposits in excess of that amount in this bank, and said deposits were also unlawful because for some time prior to the closing of the bank it had failed to provide a good and sufficient depository bond for the securing of the deposit.

Under this state of facts there is no question but that all of the funds deposited in the National Bank of Commerce were trust funds belonging to the state of South Dakota.

After the closing of the bank the state employed an expert accountant to go through the books of the bank and the accounts in correspondent banks. He reported in part as follows:

From September 27, 1924, to February 4, 1925, A. W. Ewert as treasurer of said board deposited in the National Bank of Commerce funds which are summarized as follows:

| | |
|---|---:|
| September 27 to 30, 1924 | $ 316,332.37 |
| October, 1924 | 514,543.15 |
| November, 1924 | 591,333.54 |
| December, 1924 | 1,000,180.63 |
| January, 1925 | 811,347.66 |
| February 1 to 4, 1925 | 230,962.05 |
| Total | $3,464,698.40 |

From said accounts the treasurer paid out and deposited large sums from time to time in the completion of loans made by the rural credit board to the borrowers of its funds, and drew from said bank large sums from time to time and deposited the same in numerous state and national banks throughout the state of South Dakota.

The National Bank of Commerce carried accounts in seven correspondent banks. The cash on hand in the vault of the National Bank of Commerce at the time of its suspension was $27,881.13. The method pursued to arrive at a calculation of the trust fund or balance of rural credit board money in the respective accounts is as follows:

Funds of the rural credit board traced to an account with the correspondent bank of the National Bank of Commerce were designated as rural credit trust funds in the amount of the rural credit funds in that remittance or the balance in the account at the close of that day, whichever was the smaller. This amount was considered and treated as the trust fund until the total balance in the account was smaller, when the smaller, or less amount, was taken as the trust fund, or until another deposit of rural credit board funds was made in that account, when the trust fund was increased, providing the total bal-

ance in the account was larger than the rural credit board fund. The smallest amounts these respective accounts contain after the rural credit board funds were commingled with other funds of the National Bank of Commerce in said accounts and on February 4, 1925, and which came into the hands of the receiver, were as follows:

| | |
|---|---:|
| Cash in National Bank of Commerce | $ 27,881.13 |
| Federal Reserve Bank, Minneapolis | 91,379.05 |
| Chase National Bank, New York.. | 80,196.47 |
| First National Bank, Chicago..... | 30,186.41 |
| First National Bank, Minneapolis... | 30,895.06 |
| Stock Yards National Bank, Chicago | 1,686.44 |
| First National Bank, St. Paul..... | 868.65 |
| Total | $263,093.21 |

(The First National Bank of Sioux City is not included, as no funds therefrom came into the hands of the receiver.)

The receiver, appellant herein, and defendant in the original suit, sets out certain specifications of errors to the findings of the court allowing the above amount to the plaintiff, which we will now discuss.

One of his main contentions is that, in tracing its funds illegally deposited in the National Bank of Commerce, the plaintiff relied upon certain presumptions which the facts in this case do not warrant. The principle is contained in the following rule, most generally followed in cases of this character, based upon the reasoning in Re Hallett's Estate, 13 Ch. Div. 696, and which is generally referred to in the case of Empire State Surety Co. v. Carroll County (C. C. A.) 194 F. 593, as follows:

"It is indispensable to the maintenance by a cestui que trust of a claim to preferential payment by a receiver out of the proceeds of the estate of an insolvent that clear proof be made that the trust property or its proceeds went into a specific fund or into a specific identified piece of property which came to the hands of the receiver, and then the claim can be sustained to that fund or property only and only to the extent that the trust property or its proceeds went into it. It is not sufficient to prove that the trust property or its proceeds went into the general assets of the insolvent estate and increased the amount and the value thereof which came to the hands of the receiver. * * *

"Proof that a trustee mingled trust funds with his own and made payments out of the common fund is a sufficient identification of the remainder of that fund coming to the hands of the receiver, not exceeding the smallest amount the fund contained subsequent to the commingling * * * as trust prop-

erty, because the legal presumption is that he regarded the law and neither paid out nor invested in other property the trust fund, but kept it sacred."

The presumption is based upon the theory that the withdrawals were from money which the tort-feasor had a right to expend in his own business and that the balance which remained included the trust fund which he had no right to use. Board of Commissioners v. Strawn (C. C. A.) 157 F. 51, 15 L. R. A. (N. S.) 1100; Macy v. Roedenbeck (C. C. A.) 227 F. 347, 353, L. R. A. 1916C, 12; Brennan v. Tillinghast (C. C. A.) 201 F. 609. And such a presumption may be overcome by evidence. Brennan v. Tillinghast (C. C. A.) 201 F. 609, 614; Board of Commissioners v. Strawn (C. C. A.) 157 F. 49, 51; Titlow v. McCormick (C. C. A.) 236 F. 209; Schuyler v. Littlefield, 232 U. S. 707, 34 S. Ct. 466, 58 L. Ed. 806.

The evidence does not disclose and neither party offers proof for whom the withdrawals were expended; that is, there is no evidence as to whether the withdrawals, or any of them, from the bank or from the several accounts of the correspondent banks were for the benefit of the trustee or the cestui que trust.

Appellant seriously and earnestly contends that under such a state of facts such a presumption should not prevail, and that without such a presumption the state has failed to trace and identify any trust funds. He contends: That under the facts in the case it would be inequitable to permit this presumption to prevail. That in order to trace its funds under the situation here, the burden is upon the state to show that the withdrawals were not made for its benefit. That the evidence raises a fair inference that most of the withdrawals were for the benefit of the cestui que trust. That under the evidence the other depositors and creditors should be considered as cestui que trustent or innocent third parties. That it is inequitable to permit the presumption to prevail as to the funds in the correspondent banks and cash in vault, as the uncertainties of withdrawals and exchanges make the results as to whether there was any trust fund left in the correspondent banks too uncertain for identification, and too uncertain to apply the rule that the residue of these funds were trust property of the state.

The facts upon which appellant relies as bearing upon these contentions, are, briefly, that some $60,000,000 of these funds were deposited in this bank in a little less than seven years, constituting a daily depositing

and checking amounting to about $1,000,000 a month. Between September 27, 1924, and February 4, 1925, there was an aggregate deposit in the National Bank of Commerce of $3,464,698.40, and that throughout this period with few exceptions the daily deposit balance of the rural credit board account in this bank varied between $150,000 and $300,000. So that the approximate amounts of deposits on the one hand and withdrawals on the other were about the same, and somewhere in the neighborhood of $1,000,000 a month.

The amount of rural credit board funds on deposit for the two years prior to the suspension represented from 22 per cent. to 37 per cent. of the amount of the bank's total resources.

The evidence of the defendant also establishes that for a long period of time it had been known by the Governor and officials of the state that the board was unlawfully and illegally depositing the funds in the several depositories and that they gave their consent and approval thereto.

Monthly reports in writing were furnished by the treasurer to the secretary of the rural credit board, and this report with others was submitted to the executive accountant and filed with the Governor of the state.

The Supreme Court of the state of South Dakota in the year 1922, in the case of State v. Ewert, 45 S. D. 550, 189 N. W. 522, issued a restraining order against said A. W. Ewert as treasurer, from continuing to violate the law and directed that he withdraw from the several banks all deposits in excess of the 40 per cent. of the paid-in capital and surplus of the respective banks.

The joint auditing committee of both branches of the Legislature made a report in writing to the Legislature approving the actions of the board which was published. The matter got into the platforms of the respective political parties and the Governor of the state in public speeches defended the actions of the rural credit board in the excess deposits as being a public necessity, by reason of the financial depression. The evidence abundantly shows and establishes knowledge and willful violation of the law on the part of the state officials.

The National Bank of Commerce also made its regular bank reports to the Comptroller of the Currency of the United States, which were published in the newspapers, and wherein no claim was made by the bank that the funds deposited by the rural credit board

were trust funds, but they were set out as individual deposits and time deposits as belonging to the bank. This situation might be of controlling importance, were it not that the rules of equity applicable to the facts in this case are well settled by the courts.

■■ The trust having been established, to regain its funds it is then necessary for the claimant to show that the receiver, as such, has in his hands a common fund in which the claimant's deposit is included. These matters being established the law adds thereto a presumption that the bank in expending the funds expended its own funds and not the trust fund; in other words, when the trust is proven and there is a showing that the receiver has a common fund in his hands, this, plus the presumption, makes a prima facie showing entitling the claimant to a preference in the event it is not overcome by the proof of the receiver. Leach v. Plymouth County Savings Bank, 204 Iowa, 760, 216 N. W. 16, 17; Leach v. Farmers' Sav. Bank, 204 Iowa, 1083, 216 N. W. 748, 749.

■■ The plaintiff having traced funds into a certain fund or property, the entire fund or property becomes a fund for the payment of the trust. Equitable Trust Co. v. Brass & Mfg. Co. (C. C. A.) 290 F. 712, 723; Peters v. Bain, 133 U. S. 670, 693, 10 S. Ct. 354, 33 L. Ed. 696. There is a general equitable rule that, where a wrongdoer knowingly mingles the property of another with his own in such a manner as it becomes indistinguishable, the true owner may claim the whole mass, or, if it has been disposed of, may follow it or its proceeds as the case may be, as long as he can trace them for the purpose of fastening an equitable lien upon the property of which he has been dispossessed. Smith v. Township (C. C. A.) 150 F. 257, 260, 9 L. R. A. (N. S.) 876.

We are therefore unable to understand why the defendant should demand that the burden of proof be upon the plaintiff to show that the withdrawals in the several funds were not rural credit board funds. See Smith v. Mottley (C. C. A.) 150 F. 266, 268. The defendant makes no effort to show to whom the withdrawals were paid, but asserts that he stands upon the position that the burden of proof is upon the plaintiff to establish that every item which is claimed as a trust increased the cash assets of the bank at the time of the deposit and has reached the possession of the receiver. But by a presumption of law it has reached the possession of the receiver.

Here are shown certain deposits by the

state. They first went into the general fund of the bank and the proceeds first mingled with the cash accounts of the bank. This is the primary fund, then, to which the deposits are traced. By direct evidence parts of the rural credit board funds are traced from this primary fund to correspondent banks. Plaintiff, therefore, has met the rule that trust property or its proceeds went into specific funds which later came into the hands of the receiver. It is true it relies upon a presumption that the withdrawals were first made from the bank's property, as distinguished from the state's property. But wherein is the evidence to overcome this presumption?

Defendant's evidence, at best, shows that money in the several accounts might have been withdrawn; but, having established a commingling of trust funds in a particular fund, an equitable lien arises in favor of the cestui que trust upon the entire fund. If the funds are dissipated by withdrawal, it could easily have been shown by appellant, if he cared to allege one or more of the trust funds had been dissipated. The expert accountant was available at the trial, and the true situation could have easily been disclosed, had appellant so desired.

On February 3 and February 4, 1925, the state deposited $230,962.05 in the National Bank of Commerce. These funds went into the general account, and but $30,000 into the correspondent banks. This general deposit and fund, having been reduced to the amount of cash in the vault at the time of the closing of the bank, must in the absence of proof otherwise, be considered a part of a general fund upon which the state had a lien. Smith v. Mottley (C. C. A.) 150 F. 266, 268.

The receiver stands in the place of the bank, taking the assets in trust for the creditors, subject to the claims and defenses that might have been interposed against the insolvent corporation. Skud v. Tillinghast (C. C. A.) 195 F. 1, 5; Scott v. Armstrong, 146 U. S. 499, 13 S. Ct. 148, 36 L. Ed. 1059. The state having shown by direct evidence that this trust fund was commingled in certain cash funds or accounts the proceeds from which afterwards came to the hands of the receiver, the mere showing by the defendant that, on account of the magnitude of the business, the cestui que trust might have dissipated these funds, is not controlling.

We are unable to see why the presumption should not prevail, despite the fact that the bank was acting illegally for a long period of time, or acted illegally in other particu-

lars. It is not shown the state of South Dakota acted wrongfully or illegally, and therefore its rights cannot be affected by such acts or conduct on the part of the bank, nor, as hereinafter shown, can its rights be prejudiced by the wrongful acts or conduct on the part of state officials, at least as far as the record in this case is concerned. Nor can we see any reason why the state could not trace its funds into the accounts of the correspondent banks and treat them as separate accounts from the general cash assets of the bank. See Brennan v. Tillinghast (C. C. A.) 201 F. 609.

It is true that withdrawals could be made in favor of a cestui que trust from a fund in a correspondent bank in excess of the amount of the trust fund deposited in that fund, and that no credit would thereby be given for a decrease of trust funds in other correspondent bank accounts. But such withdrawal is bound to result in a decrease in the unlawful deposits in the bank, and no prejudice could result in tracing funds in other correspondent banks, as long as the amount recovered did not exceed the amount of deposits in the bank.

Despite appellant's vigorously protesting against a finding for the state, in the light of this evidence as to the day by day withdrawals and the uncertainties resulting from the handling of so large a trust fund in several accounts, the rules applicable must be observed. The tracing of funds into the several correspondent banks was direct and certain, and in the absence of a showing of dissipation, came into the hands of the receiver, and plaintiff was entitled to that amount upon which it had a lien in the commingled fund. While as to the balance of cash in the bank, the amount is so small in comparison to the deposit of more than $230,000 made two days before the bank failed, that a court could not find otherwise than that the sum so remaining in the cash account of the bank was trust funds belonging to the state.

In one of the correspondent bank accounts, however, the evidence shows and establishes that there were withdrawals from the rural credit board account which should have been deducted from the rural credit board fund deposits in that account. The account with the First National Bank of Chicago shows a deposit on February 2, 1925, of $98,500. The evidence discloses that on the same date rural credit board funds were withdrawn from this account in the sum of $75,000 and placed in other correspondent banks. The amount of the deposit of rural credit board funds on that date therefore was

reduced to $23,500, and this should have been the amount allowed as traced to this fund instead of $38,063.96, and the amount of the money traced by the plaintiff must be reduced in the sum of $14,563.96.

Appellant also contends that under the record the plaintiff is estopped to claim a trust fund. This is based upon the foregoing facts, and the evidence of depositors that they relied upon the representation of the bank from its published accounts and its method of business carried on with the approval of the officers of the state that state funds were the property of the bank, and had they known of any rights of the state to claim a trust they would not have entrusted their money to the bank.

The law is clear that the state, as such, cannot be estopped by the unauthorized or fraudulent acts of its officers. The state comprises all its citizens. It can only act on the matter here considered through its Legislature. The unlawful acts and knowledge on the part of its officers are not controlling. Gibbon v. U. S., 8 Wall. 269, 19 L. Ed. 453; Whiteside v. U. S., 93 U. S. 247, 23 L. Ed. 882; U. S. v. Lee Wilson & Co. (D. C.) 214 F. 630, 651, and cases cited; Pine River Logging Co. v. U. S., 186 U. S. 279, 291, 22 S. Ct. 920, 46 L. Ed. 1164.

To effect an estoppel as against the state all of its citizens would have to give their express or implied consent to the procedure. We know at least that the members of the Supreme Court of the state did not consent. We are unable to see what difference it makes whether the state in carrying out the purposes of the Rural Credit Act was engaged in a private enterprise or governmental function. We are concerned entirely with the result of unlawful acts of officers in disregarding a statute expressly prohibiting an act.

As stated by the trial court: "In the case at bar it was not within the power or legal capacity of any official or officials of the state to misappropriate these rural credit funds of the state. The rural credit funds were the property of the state of South Dakota. With these funds the rural credit board, including the treasurer of the board, had nothing to do, except administer them in strict conformity with the provisions of the laws of the state of South Dakota. Admit that the Governor and members of the board, and various people throughout the state of influence, political and otherwise, had knowledge of this, such knowledge as made all parties to it, they thereby became participants in the tort, with no power to make it legal. And the fact, if it be a fact, that they have knowledge of the wrongdoing adds nothing to its legality, nor does it deprive or tend to deprive the plaintiff of title to its property. And this is true, regardless of the character of the business that was involved, whether private or governmental."

We are very clear that under the rules of law the state is not estopped to claim these funds as a trust fund in so far as the same may be traced and distinguished as such, and that the equitable rights of the defendant as shown by the record cannot prevail against this established rule of law.

Appellant seriously and forcibly contends that, on the broad principle of equitable rights, to permit the state, under the circumstances here disclosed, to obtain a prior right on the funds in the insolvent bank in such a large amount, is inequitable and unjust to the creditors and depositors of the bank, and invokes the rule as to the rights of innocent third persons. He also insists that the depositors should be considered as cestui que trustent and that their rights should be considered on an equality with those of the plaintiff. However, it is not for the defendant herein, but for those whose rights are thus claimed, to raise and establish any such equality of rights.

It must be admitted that one of the prime requisites of the right to follow and regain trust funds is a showing that the trust fund has increased the present assets of the bank and that it may be taken therefrom without impairment of the rights of creditors. Keeping in mind that under the rules of law as herein set out, we are considering property that has never lawfully passed from the control of the state to the bank, and are seeking to refund to the state from certain specific funds that property, and that property only which in that fund belongs to the state, or at least upon which the state has an equitable lien, there can be no detriment in a legal sense to the rights of a third person.

Creditors should not complain if that is returned to the state to which neither the bank nor the receiver had any just title. Board of Commissioners v. Strawn, supra. In a broad sense, of course, to give any person a priority would be a discrimination as against others having claims against the bank; but when we consider that we are only returning to the state what was unlawfully taken from it, and that it is entirely separate and apart from that fund which is to be distributed to creditors, we have a different situation.

The state has clearly met the several re-

quirements and rules set up by reason and authority for the protection of innocent third persons, and the money now in the hands of the receiver, which has been distinguished and pointed out as money belonging to the state, except for the reduction of $14,563.96, must be determined as property belonging to the state.

It follows that the amount of trust funds allowed must be reduced to the sum of $248,-529.25, and the trial court is directed to so amend its decree. But in all other particulars the actions and conclusions of the trial court and its decree are hereby affirmed.